McGeehan, Appellant, vs. Ashland County, Respondent.
Same, Respondent, vs. Same, Appellant.

*January 12—February 8, 1927.*

*Taxation: Lands owned by Indians: Effect of certificate of competency: Purchase of land out of trust funds belonging to Indian: Land previously taxable acquired by noncompetent Indian.*

1. Where an Indian ward, for a cash consideration, out of funds in the hands of an Indian agency purchased land from an Indian who had been granted a certificate of competency, the transfer of title was by purchase within the meaning of sub. (6), sec. 1038, Stats. 1919.  pp. 179, 184.
2. Neither the secretary of the interior nor the Indian department has authority to place restrictions on the alienation of property purchased for an Indian ward out of trust funds so as to prevent the state from taxing the property purchased; and the lands are subject to state taxation.  p. 184.
3. Land owned by the heirs of a noncompetent Indian who purchased it from a likewise noncompetent Indian, and which had never been owned by any one in fee simple without any restriction on alienation, was not subject to taxation.  p. 185.

Appeals from an order of the circuit court for Ashland county: G. N. Risjord, Circuit Judge. *Affirmed on both appeals.*

Validity of a tax deed issued upon Indian lands.  The complaint set forth two causes of action.  The defendant demurred to each cause of action.  The demurrer was sustained as to the first cause of action and overruled as to the second. Both parties excepted and both parties appealed from the order.

The cause was submitted for the plaintiff on the brief of *M. E. Dillon* of Ashland, and for the defendant on that of *Geo. F. Merrill,* district attorney of Ashland county.

Rosenberry, J.  The learned trial judge filed a carefully considered opinion which so clearly states the issues in-

volved, sets forth the legal principles and the conclusions to be drawn from their application, that the court feels it can do no better than to adopt the opinion of Judge Risjord as the opinion of this court. It is as follows:

"This is an action on two counts brought to recover moneys paid for certificates of sales for nonpayment of taxes on lands on the Indian reservation in this county. The situation involved in the two causes of action is somewhat different.

"In the first cause of action it is alleged, substantially, that the premises are part of the Bad River reservation, under the treaty of September 30, 1854, and were allotted to one Robert Charette, an Indian ward of the government and member of the Bad River band, and patent issued to him on January 26, 1895, with the restriction on alienation commonly imposed on allotments, under the said treaty. That on April 25, 1915, a certificate of competency was granted to the said Robert Charette. This certificate completely released the restriction and authorized Charette to sell, mortgage, or dispose of the lands at his pleasure.

"Shortly thereafter, namely, on August 25, 1915, Robert Charette and his wife deeded the land to one George B. Martin, an Indian ward of the government, for a consideration of $800, and this deed contains a condition against alienation by said Martin, unless consent thereto is first obtained from the secretary of the interior. No such certificate has ever been obtained from the secretary, and the said George B. Martin still owns the premises, subject to such condition. Subjoined to the deed from Charette to Martin is a statement by the superintendent of the Indian agency at Ashland to the effect that the land described in this deed was purchased for the grantee 'with funds derived from the sale of timber held in trust by the United States for George B. Martin, and that said purchase was made and said deed executed under the instruction of the secretary of the interior,

with the intention that the land so purchased shall be subject to the supervision of the department of the interior of the United States, as therein provided.' To this complaint the defendant county interposed a general demurrer. The question is: Was this land taxable by the state in 1919?

"Sec. 1038 of the Statutes of 1919, specifying the property in the state exempt from taxation, by sub. (6) provides: 'The property of Indians, not citizens, except lands held by them by purchase.' Said Martin having paid to Charette a cash consideration of $800 out of his funds in the hands of the Indian agency, the transfer of the title from Charette to Martin was by purchase. 'Lands purchased for a valuable consideration by an Indian and conveyed to him is transfer of title by purchase.' *Quinney v. Stockbridge,* 33 Wis. 505; *Hilgers v. Quinney,* 51 Wis. 62, 8 N. W. 17.

"The act of Congress of May 8, 1906 (34 U. S. Stats. at Large, 182), provides that when an Indian allottee is given a patent in fee for his allotment, 'then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the territory in which they shall reside; . . . Provided, that the secretary of the interior may, in his discretion, and he is hereby authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time, to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or tax shall be removed.'

"It is not questioned but that the lands dealt with in the first cause of action became subject to taxation by the state on issuing of the certificate of competency to Charette on April 5, 1915, so that the sole ultimate question involved on the first cause of action is whether the premises became exempt from state taxation by reason of the insertion of the condition against alienation in the deed from Charette to Martin. In other words, the question is whether or not the

secretary of the interior may, by purchase of land in the state otherwise subject to taxation out of funds held in trust by the government for an individual Indian ward of the government, impose restrictions on alienation of property so purchased to the extent of exempting it from state taxation, though not exempted by the state. This is a federal question and its solution is governed by federal law.

"The authority of the secretary of the interior to control funds of Indians upon this reservation has its basis in the treaty of September 30, 1854, and acts of Congress thereunder. By the treaty the Indians ceded to the United States government, for a consideration, certain tracts of land theretofore considered as belonging to the Chippewa Indians of the Lake Superior region, reserving some lands for themselves.

"Art. 3 of the treaty provides that the lands reserved to the Indians should be assigned 'to the parties entitled to the lands in severalty,' and the President was authorized to 'issue patents as fast as the occupants become capable of transacting their own affairs, with such restrictions upon the power of alienation as he may see fit to impose.'

"Under this treaty, and several acts of Congress, releases have been issued to a large number of Indians of the Bad River reservation, under the instruction of the secretary of the interior. Such a release was made in the Charette case under sec. 1 of the act of Congress of June 23, 1910, commonly called certificate of competency.

"In cases of the sale of lands belonging to individual Indians or timber on Indian allotments, the proceeds were to be turned over to the Indian agencies, to be deposited in banks near where the Indians owning the funds were located and subject to withdrawal for payment to the individual owners or expenditures for their benefit under the regulations prescribed by the Indian branch of the department of the interior.

"The statute nowhere, so far as I have been able to find from the compilation of the federal statutes I have access to, directly or by implication authorizes the secretary of the interior to invest funds in its hands belonging to individual Indians in other property or to attach any conditions to the sale of property purchased for Indians by such trust funds.

"In the case of *McCurdy v. U. S.* 246 U. S. 263, 38 Sup. Ct. 289, 62 Lawy. Ed. 706, the court dealt with the power of the state of Oklahoma to tax Osage Indian lands purchased with released trust funds. The secretary of the interior paid out of the funds held in trust by the government for one Robert Panther, a noncompetent allottee, a sum of money to be applied in payment for a lot in the city of Pawhuska. The deed contained this clause: 'This conveyance is made and accepted with the understanding, and under the condition, that the above described property is to be and remain inalienable and not subject to transfer, sale, or incumbrance, for a period of eighteen years from the 1st day of July, 1913, except by and with the express consent and approval of the secretary of the interior, or his successor in office.'

"This land was part of the original Osage reservation and became a part of the city of Pawhuska when that town was organized. The land had, before it was purchased for Panther, passed into private ownership and had been taxed by the state or territory. It was taxed by the state authorities after Panther bought it, sold for nonpayment of taxes and suit started against the treasurer of the county in which the land was located to restrain the issuance of a tax deed. The court says: 'The government contended that as the land had been bought for Panther and was by deed made inalienable without the consent of the secretary of the interior, it was, while so held, an instrumentality lawfully employed by the government for the protection of an Indian, and as such exempt from taxation by the state or any subdivision

thereof.   On the other hand, the county treasurer and the city contended that Congress had not authorized the secretary of the interior to invest the trust fund for the Indians' benefit, or to impose restriction on alienation of property purchased with money from that source; that the insertion in the deed of the provision against alienation did not have the effect of exempting the land from taxation by the state; and that it was not the intention of Congress to do so.   It was also contended that such exemption was not within the powers of Congress as limited by art. IV, sec. 3, and the ninth and tenth amendments of the constitution, since, before imposing the restriction by deed, the land had become a part of the private property, subject to the jurisdiction of the state.'

"The court also said that the secretary's authority to release lands belonging to the Osage Indians rested wholly upon the law of April 18, 1912.   This act conferred discretion upon the secretary of the interior to release or to withhold trust funds of the Indians:   'The secretary is authorized to prescribe the rules and regulations under which such releases shall be made; but he is not given authority to exercise control of any property in which the funds released may thereafter be invested, or otherwise create with the released funds a government instrumentality for the protection of the Osages. . . . There is nothing in the act or in the facts to which it applies that indicates a purpose to extend governmental control to property in which released funds may be invested.'

"The statutes of June 28, 1906, and April 18, 1912, both having special references to the Osage Indians, were then discussed by the court and some intimation made to the effect that Congress did not intend to exempt from taxation by the state property belonging to the Indians, under the circumstances involved in that case.

"In concluding the court said: 'While an Indian is still a ward of the nation, there is power in Congress even to reimpose restrictions on property already freed: *Brader v.*

*James,* decided this day (246 U. S. 88, 38 Sup. Ct. 285) ; but Congress did not confer upon the secretary of the interior authority to exercise such power under the circumstances of this case, or to give to property purchased with released funds immunity from state taxation.'

"This case, therefore, is authority of the highest order to the effect that Congress may impose restrictions upon alienation of property purchased for an Indian ward, by trust funds, but that no such restriction may be made by the department without statutory authority.

"This case leaves out of consideration the question of whether or not Congress may constitutionally exempt state property by such means. That question has not been decided by the United States supreme court, so far as I can find, but is referred to in *Sunderland v. U. S.* 266 U. S. 226, 45 Sup. Ct. 64, 69 Lawy. Ed. 259. There the court considered a restriction upon alienation placed by the secretary of the interior on land purchased by proceeds of sale of part of a restricted allotment. The grantee sold without consent of the secretary of the interior and the question of the title came up. It was contended : '(1) That Congress is without power to authorize the imposition of restrictions upon the sale of lands within a state which have passed to private ownership. (2) That Congress has not, in fact, conferred upon the secretary such authority.' The court stated the general rule to be that the control of real property rested with the state where the property is located, but held that such a restriction upon alienation, for a limited time, might legally be made; that placing such a restriction upon the sale of the land was not an invasion or interference with rights of the state; that if Congress saw fit to place such a restriction upon the sale of the land, under the circumstances, it had a right to do so; that the state was not concerned since it had no statute or policy of which the court was aware limiting the power of Congress to restrict sale of land belonging to Indians. The court then said : 'If there were, or if the power

of state taxation were involved, we should consider the question of supremacy of power; but no such question is presented by this record.'

"*U. S. v. Gray,* 284 Fed. 103, and *U. S. v. Ransom,* 284 Fed. 108, sustain the right of the state, under the Oklahoma statutes, to tax lands purchased for Indian wards of the government with trust funds where the property purchased had previously been legally taxed. Though the conditions that obtained in those cases and the statutory laws applicable to them were somewhat different from this case, the principles there applied were substantially the same as in this. In many cases where this question of state control has been considered, the property was held in trust by the government for the Indians. These Chippewa Indian allotments are granted in fee simple with restrictions on alienation. They are patents in fee with a condition—in other words, restricted patents. No property rights are retained by the United States.

"Particularly in view of the fact that Congress, so far as I have learned from an examination of the statutes, has not given the secretary of the interior or Indian department authority to place restrictions upon alienation of property purchased for an Indian ward by trust funds and that no such authority seems to be implied from any statutory provision, no such restriction may be imposed thereon by the Indian department as to take away from the state the power to continue to tax such property.

"I am of the opinion, therefore, that the land described in plaintiff's first cause of action was subject to taxation for the year 1919.

"The second cause of action presents a somewhat different situation as to the status of the property involved. There, in 1920, when the assessment here in question was made, the land was owned by the heirs of Catherine Beson, who, as found by the county court, were her husband and her six children. No certificate of competency had been issued

to any of the owners. The land had never been owned, therefore, by any one in fee simple without any restriction on alienation, unless the restriction contained in the deed to Catherine Beson was ineffective as such.

"In the first cause of action the land was purchased for a noncompetent Indian by funds belonging to such Indian in the hands of the department, and the land had previously been released from any restriction. Here a conveyance was made, by authority of the department, by one noncompetent Indian to another noncompetent Indian, and, at the time it was assessed for taxes, owned by presumably noncompetent Indians, members of the Odanah band of Chippewa Indians and heirs of a noncompetent Indian.

"Under these circumstances I am inclined to the view that in 1920 the land was exempt from state taxes. It may not seem logical to hold that land previously subject to taxation, purchased for a noncompetent Indian out of funds in the hands of the Indian department, belonging to Indians, is not exempt from taxation, while land not theretofore subject to taxation, but purchased by funds in the hands of the government for a noncompetent Indian, is exempt. But there is a difference in these two cases. The conclusion I have reached in deciding the issue involved in this second cause of action is arrived at from the same authorities consulted in deciding the issue raised on the first cause of action and no further citations are here made. The precise facts presented in these two alleged causes of action have not been passed upon in any cases I have found.

"The state may not in any manner control the instrumentalities the government employs in caring for its Indian wards. There are grounds for assuming that the government did not intend to exempt property theretofore taxable by the mere purchase of the property for the Indian with funds derived from proceeds of allotments, in the absence of any statute directing such exemption. In the other the intention is apparent that the government, not having released the

restriction upon alienation but merely transferred the title from one noncompetent Indian to another, desired to retain full control of the property, including exemption from state taxation. Among other provisions the act of Congress of May 27, 1902 (32 U. S. Stats. at Large, 275), and that of March 1, 1907 (34 U. S. Stats. at Large, 1018), are declaratory of such intent."

We should do no more than concur in the opinion of Judge RISJORD were it not that a case decided since the opinion was filed has been called to our attention (*U. S. v. Ramsay*, 271 U. S. 467, 46 Sup. Ct. 559, 70 Lawy. Ed. 1039). We shall say no more than that we are of the opinion that that case does not touch the issues involved here. The lands affected by the conveyances in that case had never been freed from the restrictions imposed upon them by authority of Congress, whereas here, as clearly indicated in the decision, the question raised by the demurrer to the first cause of action relates to the status of lands which have once been freed from restriction and passed under the taxing jurisdiction of the state of Wisconsin, and further, whether or not that land can be withdrawn from the taxing jurisdiction of the state of Wisconsin by subsequent purchase for the benefit of an Indian trust fund.

*By the Court.*—The order appealed from is affirmed upon both appeals.