**STATE OF WISCONSIN, Plaintiff,**

v.

**Odric BAKER, individually and as Chairman, Lac Courte Oreilles Tribal Governing Board; Pete Larson, individually and as Vice Chairman, Lac Courte Oreilles Tribal Governing Board; Margaret Diamond, individually and as Secretary-Treasurer, Lac Courte Oreilles Tribal Governing Board; Charles Diamond, individually and as a member, Lac Courte Oreilles Tribal Governing Board; Theresa Williams, individually and as a member, Lac Courte Oreilles Tribal Governing Board; Rick St. Germaine, individually and as a member, Lac Courte Oreilles Tribal Governing Board; and Their Agents, Employees, and Subordinates, Defendants.**

No. 76–C–359.

United States District Court,
W. D. Wisconsin.

Oct. 23, 1981.

John D. Niemisto, Asst. Atty. Gen., State of Wis., Madison, Wis., for plaintiff.

Larry B. Leventhal, Minneapolis, Minn., for defendants.

Gene M. Potack, Wisconsin Judicare, Inc., Wausau, Wis., for intervenor.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

### Findings of Fact

1. The Lac Courte Oreilles ("LCO") reservation was authorized by Art. 2 of the Treaty of September 30, 1854 ("1854 treaty"), and was described as "a tract of land, equal in extent to three townships."

2. Other portions of the same treaty defined and authorized reservations for other bands by metes and bounds descriptions.

3. Parties to the 1854 treaty included the United States and two groups of Chippewa bands, the Chippewa of Lake Superior and the Chippewa of the Mississippi.

4. The LCO band, of which defendants are members and officers, belongs to the group known as Chippewa of Lake Superior.

5. A group or band of Chippewa identified as the LCO band was represented in the signing of the 1854 treaty and had its principal village in the vicinity of the current LCO reservation.

6. Selections of territory for a reservation were made by United States agents and representatives of the LCO band in 1859 and 1865.

7. Descriptions of the 1859 and 1865 selections were by reference to United States Public Lands Surveys (USPLS) plats of the townships involved. The USPLS surveys embody a rectangular system.

8. A fractional section is a unit of description under the USPLS system, and is a section containing appreciably less than 640 acres, usually as a result of an invasion by a meandered body of water or by other land which cannot properly be disposed of as part of that section.

9. The Indian agents assisting the LCO representatives in their land selections, and probably many of the LCO representatives, understood that selection of all of a fractional section for the reservation would convey to the tribe less than 640 acres of dry land, the specific amount of dry land being the acreage indicated for the particular section on the USPLS plat.

10. On August 2, 1869, United States Agent Colonel John W. Knight was sent a copy of instructions by the Commissioner of Indian Affairs to be utilized in the selection of a permanent reservation to be in as compact a form as practicable and to contain the full amount of 69,120 acres.

11. On September 30, 1869, Agent Knight stated his actions in obedience to these instructions and described in explicit terms by reference to the USPLS plats and the outboundaries of the reservation recently selected by the "Chiefs in Council" of the LCO band.

12. The reservation boundaries described by Agent Knight in his September 30, 1869, letter intersected navigable meandered lakes, including Lac Courte Oreilles and Grindstone Lake, and encompassed all interior navigable waterways.

13. Indian Agent S. N. Clark was responsible for assisting and supervising the final selection of reservation lands under instructions to him dated December 18, 1872 from the Commissioner of Indian Affairs. Those instructions indicated to Agent Clark that he was to consider the 1859 list of selections, the 1865 list of selections, and the 1869 boundaries reported by Agent Knight. Agent Clark, in addition, was told to obtain the view of the Indians and to

conform the reservation to those views as nearly as possible.

14. Agent Clark was instructed to deduct from the reservation approximately 1,500 acres of state swampland, identified specifically by list, and section 16 of each township. Areas not included on the 1873 selection list were not intended to be included in the LCO reservation.

15. The intent of the parties developing the 1873 list was that all elements of the list, including the statements of "Area," be included in the definition of the reservation.

16. The selection list transmitted by Agent Clark on February 17, 1873, was the result of those December 18, 1872, instructions.

17. The LCO reservation was not defined or established in final form until March 1, 1873, at which time the Secretary of Interior approved the land selection list transmitted by Agent Clark.

18. The 1873 list describes the reservation by township, range, section, acreage, and, at times, by quarter and quarter-quarter section and government lot numbers.

19. The 1873 list defines the reservation by reference to the rectangular system of the USPLS.

20. Interpretation of the 1873 list requires reference to original USPLS plats of the townships from which the reservation was selected.

21. Selection of the contents of the 1873 list, and probably earlier lists, was made by consultation of LCO representatives and federal Indian agents; the parties had before them USPLS plats of the relevant townships during such consultation and selection.

22. After the first selection of reservation territory in 1859, LCO representatives and their agents had selected additional tracts of land equaling approximately 12 sections, or 7,680 acres of land.

23. The Indian agents were instructed, and the agents and LCO representatives intended, that fractional sections be noted, and tracts of land carefully selected, so that the tribe would have the maximum amount of dry land authorized for the reservation, consisting of about 69,114 acres.

24. The 1873 list defines the contents of the LCO reservation and is the primary document to be construed.

25. Although the reservation was defined and established by the 1873 selection list, the boundaries of the reservation were not marked until 1876.

26. Henry Esperson of LaCrosse, Wisconsin, had been hired to survey allotments on the Bad River and LCO reservations in 1875 and 1876 and was hired additionally in 1876 to survey, run, and mark the "outboundaries" of the LCO reservation.

27. The instructions and information given and known to Esperson for the 1876 survey of the reservation outboundaries included: the 1873 selection list; the USPLS township plats to which the list is referenced; the field notes of the original township surveys; Esperson's June 23, 1876, contract to survey the outboundaries; the Act of Congress of May 29, 1872, referred to in that contract; and the official United States Land Office surveying instructions, printed in 1871, and entitled "A Manual of Instructions to Regulate the Field Operations of Deputy Surveyors."

28. The contract to survey the outer boundaries of the LCO reservation required Esperson to survey in exact accordance with requirements of the 1871 "printed Manual of Surveying Instructions."

29. Esperson undertook a retracement and not a new resurvey. He identified existing monuments and distances. The official 1871 United States Land Office printed Manual of Instructions did not require Esperson's retracement survey to calculate and return distances across the meandered lakes.

30. Esperson's field notes of his survey of the outboundaries indicate that he dropped a survey line at each meandered lake he encountered; that he usually found existing meander posts at those points; and that he set meander posts at such points when he found no existing posts.

31. Esperson did not return distances across any of the meandered lakes on the boundaries of the reservation; he did return distances for every other portion of his survey, including unmeandered bodies of water.

32. Esperson made no notation that he was excluding from the surveyed reservation the entirety of each meandered lake he encountered in setting the outboundaries. He made no notation that with respect to each meandered lake he encountered, he was including some portion within the surveyed reservation. He made no notation whether he was including within the reservation those interior meandered lakes which he did not encounter.

33. Meandered lakes on the exterior boundaries of the reservation under the Esperson survey included those subsequently known as: Lac Courte Oreilles, Little Lac Courte Oreilles, Grindstone Lake, Spring Lake, Little Round Lake, Squaw Lake, Chief Lake, Pokegama Lake, Cranberry Lake, and James Lake (Plaintiff's Exhibits 10–B and 10–C; Defendants' Exhibit 61). Meandered lakes within the "outboundaries" under the Esperson survey included Blueberry, Devil's, Ashegon, Gurno, Indian, Christner, Scott, Two Boys, and Moonshine Lakes, and portions of the Chippewa River which had also been meandered as a lake.

34. The LCO band controlled all access to Blueberry, Indian, Gurno, Christner, Scott, Two Boys, and Moonshine Lakes when the reservation was established, by virtue of ownership of all surrounding land. The band did not control all access to lakes lying on the exterior boundaries of the reservation.

35. On the 1876 official map of the LCO reservation, approved by the Commissioner of Public Lands and based on the field notes prepared by Esperson, appear both a dotted line and a shaded line passing through the section lines contained in Grindstone Lake and Lac Courte Oreilles. The 1876 map also uses an identical shaded line to designate the excluded Section 16 school lands.

36. The Chippewa Flowage, also known as Lake Chippewa, is an artificially enlarged, navigable lake, formed in the 1920's by the impoundment of the waters of the Chippewa River.

37. Of the original 69,120 acres in the reservation, approximately 26,000, or 37%, is presently owned by non-Indians, 17,000 acres, or 24%, is owned by the LCO band, and 26,000 acres, or 39%, is allotted lands owned by individual members of the LCO band.

38. By the process of allotment and sale of tribal land to non-Indian persons, public access now exists to the Chippewa Flowage, Lac Courte Oreilles, Little Lac Courte Oreilles, Grindstone Lake, Spring Lake, Little Round Lake, Squaw Lake, Chief Lake, Pokegama Lake, Cranberry Lake, James Lake, Blueberry Lake, Ashegon Lake, Indian Lake, Scott Lake, Two Boys Lake, Moonshine Lake, and those portions of the Chippewa River which were meandered as a lake.

39. The official 1911 map of the LCO reservation and the contemporary United States Geological Survey (USGS) map show: (a) the western boundary of the reservation passing through Grindstone Lake and Lac Courte Oreilles; and (2) the interior meandered waterways lying within the outboundaries of the reservation. In these respects, the 1911 map and the contemporary USGS map are identical to the description of the LCO reservation contained in Agent Knight's 1869 letter (see finding 12, above).

40. Traditionally, the Chippewa exploited the fruits of their land and water habitat in an annual cycle which took them from their winter homes north to their summer homes near Lac Courte Oreilles.

41. During the fur trade period in northern Wisconsin (approximately 1700 through 1840), trading posts were established in a number of locations in northern Wisconsin.

42. The most prominent post was located at La Pointe on Madeline Island and subposts were located at Lac Courte Oreilles, Lac du Flambeau, and St. Croix.

43. By the mid-1830's the once abundant large game animals in northern Wisconsin had been substantially depleted.

44. By the mid-1830's the Chippewa bands had become dependent upon their traders for trade goods, including foodstuff and clothing.

45. The Chippewa developed close ties with the traders through intermarriage and reliance upon the traders as representatives of their interests, especially in negotiations with government agents.

46. During the fur trade periods, the Chippewa developed an understanding of the use of money and used money for the purpose of trade goods.

47. The waters in and around the LCO reservation were used by Indian and non-Indian persons as navigation and trade routes during the fur trade period, the treaty period (1837 to 1854), and into the 1870's.

48. By 1854 the fur trade period had all but ended in northern Wisconsin.

49. In 1826 La Pointe, already a trading center, became the focus for government and, later, intensive missionary work among the Chippewa.

50. By 1837 timber cutting was already occurring in Chippewa territory near the present LCO reservation.

51. By 1854, the lumbering and mining industry was well established in the territory ceded in the 1837 and 1842 treaties, although most of the concentration was in the southern regions and along the shores of Lake Superior.

52. Annuity payments in return for the Chippewa land cessions of 1837 and 1842 eventually replaced trade goods in the Chippewa economy.

53. Likewise, the government Indian agents took over many of the political, social and economic functions once performed by fur traders in Chippewa society.

54. Tribal spokesmen at the 1837 treaty negotiations were aware of the potential impact that the sale of their land would have on their ability to sustain themselves through hunting and fishing activities un-less such rights were reserved in the ceded territory.

55. Chippewa at the 1837 treaty negotiations understood the importance of securing the payments for the sale of their land in money and goods as early and for as long as possible.

56. By 1854 the LCO band's primary source of economic support was annuities from the 1837 and 1842 treaties; expansion of the lumber and mining industries in northern Wisconsin provided significant sources of employment for tribal members of many Lake Superior bands after about 1865.

57. By 1854 the Chippewa bands were more dependent upon agriculture and upon the goods and supplies received annually as payment for the 1837 and 1842 land cessions than they were upon hunting and fishing activities.

58. A majority of the Lake Superior Chippewa had undergone substantial cultural change by the time the 1854 treaty was negotiated; such changes included, among others, education, economy and means of subsistence, religion, dress, housing, and the like.

59. By 1854, the Chippewa in northern Wisconsin were considered by their non-Indian neighbors peaceable and civilized.

60. However, as of about 1854, the LCO Chippewa were the most unassimilated and traditional of all the Wisconsin Chippewa.

61. As of about 1854, the area around Lac Courte Oreilles was one of the most remote and underpopulated areas in the State of Wisconsin. Both the lack of non-Indian population and the excess amounts of water in the area made the area a desirable place for the establishment of a permanent Indian homeland from the point of view of the United States, as well as from the point of view of the LCO Indians.

62. In 1854 the LCO band continued their seminomadic traditional culture of hunting and fishing in their traditional hunting grounds.

63. The LCO band did not fish commercially in the waters in and around the present LCO reservation at the time the 1854 treaty was negotiated but did fish for subsistence and home use in the lakes in and around that area.

64. Prior to 1854 the only natural products sold commercially by the LCO band were the furs from game hunted in and around the LCO reservation.

65. Because of the remote location of the proposed LCO reservation and the nomadic habits of the LCO band, there was little effort by the band or the United States in the years immediately following the 1854 treaty to identify precisely the reservation boundaries.

66. The selection of the LCO reservation in 1873 was precipitated by the band's desire to have their permanent home established and to define the boundaries in order to prevent trespass to their land, primarily by loggers coming into the area to cut timber.

67. The Chippewa controlled access to their land and water habitat and by agreement would, from time to time, permit the use of the habitat by other Indians and later by non-Indians, on conditions imposed by the Chippewa.

68. However, the LCO band, as well as other Lake Superior bands, did not have functioning or effective programs for regulating nontribal members during the nineteenth century.

69. The bands looked to the United States for protection and for law and order functions throughout all relevant time periods as reflected in the special legislation dealing with the protection sought for tribal timber assets, general trade and intercourse, and hunting and fishing on tribal land.

70. The parties to the 1837 and 1842 treaties intended to secure to the Chippewa temporary hunting and fishing rights in common with all citizens.

71. The rights enjoyed by the LCO band in the territory ceded by the 1837 treaty prior to 1854 were rights in common with all persons. The current LCO reservation is within the area ceded by the 1837 treaty.

72. The primary objectives of the United States in the 1837 and 1842 treaties were to acquire title to Chippewa lands in northern Wisconsin, Michigan and Minnesota and to open such lands to settlement and for economic purposes, including lumbering and mining.

73. Pursuant to Article 2 of the 1854 treaty with the Chippewa, the United States set apart reservations "for the use of the Chippewas of Lake Superior," including the LCO band.

74. The primary objective of the United States in the 1854 treaty was to secure title to the remaining Chippewa lands in Minnesota.

75. A secondary objective of the United States was to concentrate the Chippewa in compact locations, for various reasons.

76. Attempts to remove the Chippewa from northern Michigan and northern Wisconsin, together with the government's desire to acquire title to Chippewa mineral lands in Minnesota, precipitated the 1854 treaty.

77. The federal removal policies of the 30's and 40's gave way in the early 50's to a policy of segregation which centered around the establishment of small and isolated permanent Indian homelands.

78. The United States Indian Department and its field agents were responsible for carrying out this policy and for controlling non-Indian access to the reservations.

79. The national government's intent in the 1854 treaty was to concentrate the Chippewa on small reservations and allot the reservation land to individual tribal members, thereby forcing the Chippewa to give up their seminomadic traditional culture, which would result in the rapid acculturation and assimilation of the Chippewa.

80. The primary objective of the Lake Superior Chippewa in the 1854 treaty negotiations was to secure permanent homes at each of the present reservation locations.

81. The Chippewa representatives at the 1854 treaty negotiations understood that they were selling their lands and thereafter they would be restricted to their respective reservations.

82. The allotment provisions in the 1854 treaty reflect the Chippewa's understanding of individual ownership of land.

83. By 1854 a large number of tribal members, at least at Bad River and Red Cliff, had a clear understanding of the ownership concept of land and the fact that by the 1854 treaty actual title to remaining Chippewa land was being conveyed with no reserved rights; the Chippewa also understood that the various bands were to obtain from the national government permanent home sites which the national government would reserve and that such land would be allotted to individual tribal members rather than being held communally by the entire tribe.

84. In the years since the establishment of the reservation, from time to time, but not currently, the State of Wisconsin has purported to regulate Indians and non-Indians in respect to navigable waters within the LCO reservation.

85. The state has consistently exercised its jurisdiction against tribal members outside the reservation with respect to hunting, fishing and trapping activities, including the sale of furs.[1]

86. When the 1854 treaty was being negotiated and when it was entered into, the Chippewa in general and the LCO band in particular understood the following: The reservation was to include approximately 69,120 acres of dry land which would lie within certain townships, ranges, sections, quarter-sections, quarter-quarter sections, and government lot numbers, to be agreed upon and designated subsequently. Some of the sections so to be designated would be fractional sections. The outer perimeter of the reservation would consist of the outer lines of the particular sections or quarter-sections or quarter-quarter sections which would lie farthest to the north, to the east, to the south, to the west. For example, the northernmost segment of the western boundary of the reservation would coincide with the west line of that particular section, quarter-section, or quarter-quarter section which would lie farthest to the north and to the west of all those to be designated as parts of the reservation; the next northernmost segment of the western boundary of the reservation would coincide with the west line of that particular section, quarter-section, or quarter-quarter section which would lie immediately to the south and also farthest to the west at that latitude, and so on. These outer section-lines, quarter-section lines, and quarter-quarter section lines would mark the outer boundary of the reservation whether or not they might intersect a body of water, meandered or unmeandered, navigable or unnavigable. In the event that such a "border section" might prove to be a fractional section, it would be considered a full square for the purpose of defining the reservation boundary. Within the outer boundary of the reservation, so defined, would lie both the dry land and all the waters, meandered and unmeandered, navigable and unnavigable. Exceptions might be agreed to (as it eventuated with respect to the sections 16), but in the absence of such agreement, all that would lie within such outer boundaries would constitute the reservation. The total acreage lying within the outer boundary of the reservation so defined would certainly exceed 69,120, but it would not exceed about 69,120 acres of dry land.

---

1. Findings 1 through 85 represent an amalgam of those findings, proposed by the parties, which I am prepared to make, and do make, on my own evaluation of the record. The proposed findings as submitted by each party were not models of organization, either in terms of historical chronology or subject matter classification, and the process of amalgamation has not achieved a high order of organizational clarity. Also, it is apparent that I have included many findings that give rise to competing inferences. The purpose of this note is to make it explicit that I am aware of the lack of clarity which arises from certain of these findings. I believe that the ambivalence of some of the findings reflects as accurately as possible the ambivalence in the reality as of about 1837 to 1854. For example, as of 1854 the LCO band was in marked transition from one physical, economic and social setting to another.

87. The nature of the outer boundary of the reservation reflected in the 1873 selection list and the result of the Esperson survey were consistent with the outer boundary of the prospective reservation as it had been contemplated by the Chippewa in general and the LCO band in particular at the time they entered into the 1854 treaty, and. as described in finding 86, above.

88. When the 1854 treaty was being negotiated and when it was entered into, the Chippewa in general and the LCO band in particular understood that all of the waters, meandered and unmeandered, navigable and unnavigable, which would lie within the outer boundary of the reservation, as defined in finding 86, above, would be waters the use of which it would be within the sovereign power of the Chippewa to control and regulate as to both members and nonmembers of the tribe.

## OPINION

The central issue in this case is an issue which has been addressed frequently in one form or another by the national courts of the United States, including the Supreme Court of the United States, and also by the state courts. It is an issue which reflects vividly two powerful themes in the history of the geographical area now controlled by the government of the United States.

The first is the history of the first European settlers: the colonies they formed; the gaining of their independence from Great Britain; the caution with which those colonies then proceeded to federation and union; the importance they continued to place upon their respective sovereignties (specifically, in the present context, the sovereignty of each former colony, now a state, over the navigable waters within its boundaries); and the inevitably emerging doctrine that as the first thirteen states should be united with new sisters, each of the latter should enter that union on "equal footing" (enjoying the same sovereignty over the navigable waters within its boundaries).

The second theme is the history of the relentless physical displacement of Native Americans by the immigrants; the formal acknowledgement by the immigrants' national government of the sovereignty of the native communities which had so long preceded the immigration; and the failure of the immigrants to honor in practice that formally acknowledged sovereignty of the native communities.

*United States v. Holt State Bank,* 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926) symbolizes the first of these themes, with its preoccupation with the relationship between the national government and the governments of the states in the federal system devised by the immigrants, as it bore upon state sovereignty over navigable waters. *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970), *rehearing denied,* 398 U.S. 945, 90 S.Ct. 1834, 26 L.Ed.2d 285 (1970), symbolizes one of the happier variations on the second theme, with its sensitivity to the setting in which treaties between the United States and Indian tribes were formed, and the need to interpret those treaties as the Indians would have understood them.

■ The themes of *Holt* and *Choctaw Nation* have now been dealt with in *State of Montana et al. v. United States et al.,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). The latter decision compels the conclusions: that this court enjoys jurisdiction over the subject matter of this lawsuit, as did the Circuit Court for Sawyer County, Wisconsin, in which it was commenced; that the State of Wisconsin enjoys exclusive sovereignty over the navigable waters lying within the outer boundary of the LCO reservation, as defined in finding 86, above, with respect to the use of those waters by non-members of the LCO band and Chippewa tribe; and that the defendants and the LCO band lack power to regulate the use of those waters by such non-members.

■ I appreciate that the issue in part II of *Montana, supra,* 450 U.S. at 550–58, 101 S.Ct. at 1250–54, was framed in terms of title to the bed of the river, while in the present case, defendants contend that, even if title to the beds of the navigable waters

is in the state, as I have earlier determined and now reaffirm that it is, the LCO band was nevertheless granted exclusive power by the 1854 treaty to control the use of these navigable waters by both members and non-members. However, I think it clear that in *Montana*, the Court intended to, and did, address the central issue more boldly and sweepingly. Particularly in the face of the concurring opinion by Justice Stevens, *id.* at 567, 101 S.Ct. at 1258, and the dissent, *id.* at 569, 101 S.Ct. at 1260, I view *Montana* as a strong holding that however the Indians may have understood a treaty at the time, the presumption that the United States has not conveyed to an Indian tribe or band sovereignty over the navigable waters within a reservation is so powerful that it may be overcome only: (a) by the most definite and plain language of a particular treaty; or, perhaps, (b) by the existence of exigent circumstances and pressing need, as of the time of the treaty, requiring that the Indians possess such sovereignty over the navigable waters.

█ The treaty of 1854 with the Chippewa clearly fails to meet test (a).

I have no confidence in the proposition that test (b) stands as an independent test in the wake of *Montana*. I will assume that it does, however, at least when, as here, the treaty itself neither clearly grants to, nor clearly withholds from, the Indians sovereignty over the navigable waters within a reservation.

If I felt free to engage in fact-finding in the form of characterizing the circumstances and need of the Chippewa in general and the LCO tribe in particular, as embodied in findings 1 through 85, above, I would enter the following additional finding:

89. The understanding on the part of the Chippewa in general and the LCO band in particular described in findings 86 and 88, above, was a reflection of actually existing exigent circumstances and pressing need on the part of the Chippewa for exclusive control of the resources to be drawn from both the land

and the water within the reservation in the long years ahead, as, foreseeably, the lands and waters beyond the boundaries of the reservation were to be exploited in the course of the non-Indian migration to the northern middle west.

Should this decision become the subject of appellate review, I state explicitly that I do now make the foregoing finding number 89, but that I consider it inoperative.

I consider it inoperative because the opinion of the Court in *Montana* implies rather pointedly that the characterization of circumstances as exigent and a need as pressing is to be viewed, at least in this context, as a conclusion of law or perhaps a mixed conclusion of law and fact. In any event, in *Montana* the Court compared the circumstances surrounding the making of the treaties in question in *Choctaw, supra,* and *Montana,* and declared that: "Neither the special historical origins of the Choctaw and Cherokee treaties [in question in *Choctaw, supra*] nor the crucial provisions granting Indian lands in fee simple and promising freedom from state jurisdiction in those treaties have any counterparts in the terms and circumstances of the Crow treaties of 1851 and 1868 [in question in *Montana, supra*]." 450 U.S. at 551–555 n.5, 101 S.Ct. at 1251–53 n.5.

It is clear that the special historical origins of the 1854 Chippewa treaty and its crucial provisions resemble much more closely those of the Crow treaties in question in *Montana, supra,* than those of the Choctaw and Cherokee treaties in question in *Choctaw, supra.* Therefore, I conclude that *Montana* precludes a finding of fact or conclusion of law that the circumstances and need of the Chippewa, reflected in findings 1 through 85, above, were sufficiently exigent and pressing to overcome the presumption that in the 1854 treaty the United States did not convey to the Indians sovereignty over the navigable waters within the boundaries of the LCO reservation as defined in finding 86, above.[2]

2. To avoid uncertainty, perhaps it should be made explicit that in findings 1 through 88, above, while I intend an overall finding that the LCO reservation included the navigable waters,

In an order entered in this case on September 20, 1978, 464 F.Supp. 1377, I observed that two defenses raised by the defendants by motion (the sovereignty of the LCO band and the absence of jurisdiction in the Circuit Court for Sawyer County) "turned upon the issue which is also central to the merits of the case: whether the parties to the 1854 treaty intended that the Band be granted the right to the exclusive use of the lakes in question by the device of including the lakes in the Lac Courte Oreilles reservation, and, if so, whether this intention was carried out." I required defendants to proceed to answer the complaint "so as to permit a trial following which the motion to dismiss will be fully decided and, if it were then to be denied, the merits will be decided." I definitely considered that the proceedings held on December 14 and 15, 1978, constituted the trial of this entire action on its merits as well as an evidentiary hearing on the two grounds, described above, for the motion to dismiss.

It was somewhat surprising, therefore, to note that in recent briefing the proceedings on December 14 and 15, 1978, have been described on occasion as an evidentiary 'hearing on two issues posed by the court. The immediate significance of all this is the defendants' apparent assumption that if the case is not decided in their favor by this court on the present record, they are to enjoy the opportunity to present further evidence bearing on the question whether fishing, hunting and ricing by non-Indians within the LCO reservation threatens and has an adverse effect on the political integrity, economic security, health, and welfare of the LCO band (the so-called inherent sovereignty theory). Although plaintiff expresses a willingness that this court engage in a new and fresh consideration of this newly asserted defense, I am unwilling to do so. However, lest my views on the apparent merits of the newly asserted defense remain wholly a mystery, I make the following comment.

It is not clear whether the additional evidence which defendants may desire to present on the inherent sovereignty issue would be directed to 1981 or to 1854. I would not entertain evidence as to 1981. It is inconceivable that the exclusive power to regulate non-members' use of the navigable waters in the LCO reservation might have resided in the State of Wisconsin in 1848, 1854 and 1876, but that at some time since, that exclusive power shifted to the LCO band by virtue of changes in circumstances which caused the State's possession of that power to pose too severe a threat to the sovereignty of the LCO band. Such a theory would leave the *situs* of power a continuously open question, subject, presumably, to judicial inquiry and determination of the factual circumstances developing from year to year and from decade to decade. Therefore, any such evidence would be limited to the circumstances and needs of the LCO band as of about 1837–1854. Defendants have had abundant opportunity to present their evidence on that subject for that period.

## ORDER

1. It is ordered that defendants' amended motion to dismiss is denied. Jurisdiction is present. 28 U.S.C. § 1331.

2. It is ordered that judgment be entered declaring that: There resides in the State of Wisconsin exclusive jurisdiction to regulate hunting and fishing activities by non-members of the Lac Courte Oreilles Band on and in the navigable waters lying within the outer boundaries of the Lac Courte Oreilles Reservation, as those boundaries are defined in finding 86, above, in this opinion and order. Defendants enjoy no jurisdiction to regulate hunting and fishing activities by such non-members on and in such navigable waters.

3. It is ordered that judgment be entered enjoining defendants, their successors in office, their agents and employees from enforcing or attempting to enforce against

I do not intend a finding or conclusion that title to the beds of those waters was conveyed to the Indians by the 1854 treaty, or that sovereignty over the use of those waters (as distinct from title to their beds) was conveyed to the Indians.

any non-members of the Lac Courte Oreilles Band on any navigable water lying within the outer boundaries of the Lac Courte Oreilles Reservation, as defined in finding 86, above, in this opinion and order, the provisions of Section VIII of the Fishing, Hunting, Trapping, and Ricing Code of the Lac Courte Oreilles Band, which was implemented on or about May 24, 1976.