JAMES B. MOHR, District Attorney Vilas County
You have requested my opinion on the question of whether the state has authority to impose ad valorem property taxes on land owned in fee by Indians and located within the exterior boundaries of the Lac du Flambeau Indian Reservation.
For the reasons which follow, I believe the state and its local subdivisions have express authority pursuant to the General Allotment Act of 1887, as amended, 25 U.S.C. §§ 331, et seq., particularly 25 U.S.C. § 349, to impose property taxes on fee patented Indian lands located within the exterior boundaries of the reservation which were first allotted pursuant to the Act after February 8, 1887. The Allotment Act does not apply, however, to Indian fee patented lands allotted prior to that date directly under the Treaty with the Chippewas of September 30, 1854 and, accordingly, such lands are not taxable by the state under 25 U.S.C. § 349.
The Lac du Flambeau Reservation was created pursuant to provisions of the Treaty with the Chippewas of September 30, 1854, 10 Stat. 1109, reprinted in United States v. Bouchard,464 F. Supp. 1316, 1370-76 (W.D. Wis. 1978). For purposes of this opinion, three provisions of the treaty are particularly relevant. Pursuant to Article 2 (3), the United States agreed to set apart and withhold from sale, for the use of certain bands of the Lake Superior Chippewas "a tract of land lying about Lac De [sic] Flambeau, and another tract on Lac Court Orielles, [sic] each equal in extent to three townships, the boundaries of which shall be hereafter agreed upon or fixed under the direction of the President." Article 2 (7) authorized selection of eighty-acre allotments of land by mixed blooded persons to "be secured to them by patent in the usual form" Article 3 of the treaty requires the survey and fixing of boundaries for the various reserved tracts and authorizes the President, at his discretion, to permit the assignment of eighty-acre allotments to each head of a family or single person over twenty-one years old, and to issue patents therefor "as fast as the occupants become capable of transacting their own affairs . . . with such restrictions of the power of alienation as he may see fit to impose." *Page 76 
For purposes of this opinion, I will refer to the following three major categories of land tenure which probably include the great majority, if not all, of the lands within the exterior boundaries of the current reservation:
 1. "Trust or tribal lands": Lands held in trust by the United States, either for the Lac du Flambeau Band (Band) itself or for individual members of the Band;
 2. "Indian fee patented lands": These include both (a) lands allotted to individual Indians directly under provisions of the 1854 Treaty ("Treaty allotted lands") prior to February 8, 1887; and (b) lands allotted to individual Indians after February 8, 1887, the effective date of the General Allotment Act. In both instances, title to such lands is now held by Indians in fee simple under patents issued to the original allottees or their Indian successors;
 3. "Non-Indian lands": Lands alienated by the original Indian allottees or their successors, fee simple title to which is now held by non-Indians.
Cf. State of Wis. v. Baker, 524 F. Supp. 726, 729 (W.D. Wis. 1981) (describing land in the current Lac Courte Oreilles Reservation created by the same treaty provisions).
Your inquiry is limited to the question of whether the state and its local units of government have authority to impose property taxes on Indian fee patented lands, including both treaty-allotted lands and lands allotted after the Allotment Act became effective.[1] I understand that no one has currently challenged the state's authority to tax non-Indian lands within the reservation, nor am I aware of any substantial basis to assert such a challenge. See generally White Mountain ApacheTribe v. Bracker, 448 U.S. 136, 144-53 (1980); F. Cohen, Handbookof Federal Indian Lau, 394 n. 39 et seq. (1982 ed.) (hereafterCohen).
Furthermore, the state has not attempted to tax reservation trust or tribal lands, either those held in the name of the Band or those held in the name of individual Indian members of the Band. Assertion *Page 77 
of such authority is, of course, precluded both as to tribal lands and as to individual trust lands. The Kansas Indians, 72 U.S. (S Wall.) 737 (1866); United States v. Rickert, 188 U.S. 432
(1903); Squire v. Capoeman, 351 U.S. 1 (1956); see generally the General Allotment Act, 25 U.S.C. §§ 348-49; Indian Reorganization Act, 25 U.S.C. § 465.
In contrast to certain other areas of Indian law, the principles governing your question as to whether the state has authority to tax Indian fee patented lands are relatively well settled: "Indians and Indian property on an Indian reservation are not subject to State taxation except by virtue of express authority conferred upon the State by act of Congress."McClanahan v. State Tax Commission of Arizona 411 U.S. 164, 171
(1973), quoting United States Department of Interior, FederalIndian Law 845 (1958); Bryan v. Itasca Cty., Minnesota, 426 U.S. 373,376 n. 2 (1976).
Bryan also describes the standards for construing statutes granting states taxing authority over reservation Indians. Congress must have manifested a "clear purpose" to authorize the tax, with doubts and ambiguities to be resolved in favor of the Indians. Id. at 392. See also Cohen at 407.
The General Allotment Act is the only relevant federal statute which would appear to authorize state property taxation of Indian fee lands within the Lac du Flambeau Reservation. The initial question is whether the Allotment Act applies to any of the Indian fee patented lands on that reservation. In this regard, the distinction between those reservation lands allotted directly under the treaty and those allotted subsequent to the February 8, 1887, effective date of the Allotment Act appears to be critical. [As noted above, the Treaty of 1854 authorized allotments of lands to individual Indians and half-blooded persons. At least some reservation lands were allotted prior to passage of the Allotment Act. E. Danziger, Jr. The Chippewas of Lake Superior
97-104 (Norman, 1978). I have no information regarding the extent to which such lands remain in individual Indian fee ownership today.]
Our research leads to the conclusion that the Allotment Act does not apply to treaty allotted lands, but does apply to all Lac du Flambeau allotments made since the February 8, 1887, effective date of the Act. The general rule, of course, is that statutes are construed *Page 78 
to operate prospectively only unless there is clear legislative intent to the contrary. 82 C.J.S. Statutes § 414. Here, the language of the Act itself strongly suggests that the statute was intended to have prospective effect only. For example, various sections of the 1887 Act expressly and repeatedly refer to "allotments set apart" or "provided for" under "this Act." At the same time, the Act specifically recognized treaties and special allotment acts authorizing allotment by providing that such allotment provisions would generally control as to size of the allotment. Act of February 8, 1887, ch. 119, secs. 1, 2, 3 and 5;24 Stat. 388; now codified as amended in 25 U.S.C. §§ 331-33,348.
Consistent with the view that the Act applied prospectively only, the United States Attorney General issued a formal opinion within two years of its passage concluding that the Act was applicable only to those lands held in common at the time of its passage:
 This act provides a general system for the partition of lands which, at the time of its passage, were held in common by the Indian tribes. Its general provisions have no relation to lands that were held in severalty before its passage.
. . . .
 The whole tenor of the act shows that so far as allotments had been made under any prior laws or treaties such allotments were not intended to be disturbed nor the rights of the allottees to such lands in any way modified or impaired.
19 U.S. Op. Att'y Gen. 255, 257-58 (1889) (emphasis in original).
Accordingly, it is my opinion that the Allotment Act has no application to allotments on the Lac du Flambeau Reservation made directly pursuant to the Treaty of September 30, 1854, prior to February 8, 1887. Id.
I believe it is equally clear, however, that the provisions of the Act do apply to all Lac du Flambeau allotments made after that date. In so concluding, I am aware of an apparently contrary opinion issued September 23, 1889, by the Secretary of Interior to the effect that allotments on the reservation made after the passage of the Act were, nonetheless, to be made pursuant to the 1854 Treaty rather than the 1887 Act. 9 Interior Department 392, September 23, 1889. For a variety of reasons which follow, the Secretary's opinion appears to *Page 79 
be both incorrect in harmonizing the Treaty and the Act, and unreliable as precedent.
First, the express language of the Act is unequivocal and all-inclusive. The Act shall apply "[i]n all cases" to the allotment of reservation lands, except for a small number of tribes specifically excluded. The Chippewas were not excluded.25 U.S.C. §§ 331, 339. Furthermore, as noted above, the Act expressly refers to treaty provisions for allotment, requiring that the treaties control only as to the size of the allotment. 25 U.S.C. § 331. This proviso would be superfluous if the Act itself did not generally govern the subsequent allotment of reservation lands such as the Lac du Flambeau, where treaties already authorized allotment and allotments had, in fact, been made.
Second, contrary to the 1889 Secretary of Interior opinion, there is nothing inherently inconsistent between the general allotment provisions of the 1854 Treaty and the specific requirements of the Allotment Act. In any event, even if there were, it is well settled that treaties and statutes should be harmonized and construed in pari materia, with the later enactment controlling in case of conflict. United States v.Payne, 264 U.S. 446, 448 (1924); United States v. Jackson,280 U.S. 183, 196 (1930); United States v. Nez Perce County, Idaho,95 F.2d 232, 233-36 (9th Cir. 1938). In Payne, for example, the Supreme Court harmonized provisions of the Allotment Act with allotment provisions of an earlier treaty, specifically noting that the later statute would prevail in the case of a direct conflict. 264 U.S. at 448.
Third, it is doubtful that the interpretation espoused in the cited Interior Secretary's opinion was either consistent or of long duration. The opinion itself suggests that previous interpretations of the Act were inconsistent with regard to the application of the Act to reservations on which treaty-authorized allotment had already occurred. 9 Interior Department at 394-95. Moreover, the reasoning of the formal United States Attorney General's opinion of March 14, 1889, cited above, appears to be in conflict with the views espoused by the Interior Secretary later that same year. The United States Attorney General's opinion clearly suggests that the Act applied prospectively to all lands held in common at the time of its passage, without suggesting any exception for reservations where some allotments pursuant to treaty had already occurred. *Page 80 
Fourth, Congress, in a joint resolution approved June 19, 1902, expressly memorialized its view that "[i]nsofar as not otherwise specially provided, all allotments" should be made in conformity with the Act as amended, and "shall be subject to all the restrictions and carry all the privileges incident to allotments made under said Act . . . ." Jt. Res. 31, June 19, 1902,32 Stat. 744. It is in this context that a special allotment act approved by Congress in 1924 relating to the Lac du Flambeau Reservation must be interpreted. Act of May 19, 1924, ch. 158, 43 Stat. 132. This Act directed that certain names be added to the list of enrolled members of the Lac du Flambeau Band, required that additional allotments be made to persons thereby added to the roll and directed that such allotments be made in conformity with the Allotment Act, as amended. In context, the primary purpose of the statute appears to have been the opening of additional Lac du Flambeau lands to allotment, and the requirement that trust patents be issued in conformity with the Act was merely declarative of existing law.
Finally, the view that the Allotment Act applied prospectively to all tribal reservation lands not previously allotted unless specifically excepted is supported by the leading treatise on Indian law. As the most recent edition of Cohen declares, "Congress has imposed the General Allotment Act on the trust or restricted lands of all Indians except for members of a few tribes exempted from the Act," including "allotments under most treaties." Cohen at 420 and n. 141. See also Cohen (1941 Ed.) at 258-59. Accordingly, it is my opinion, based on the authorities cited and discussed above, that the General Allotment Act controls the question of whether the Indian fee patented lands on the Lac du Flambeau Reservation originally allotted after February 8, 1887, are now subject to state property taxes. Cf.Stevens v. C.I.R., 452 F.2d 741 (9th Cir. 1971); County ofThurston, State of Neb. v. Andrus, 586 F.2d 1212, 1218 n. 6 (8th Cir. 1978); Kirkwood v. Arenas, 243 F.2d 863 (9th Cir. 1957).
Under the Allotment Act, initial allotments, generally though misleadingly called "trust patents," were inalienable for a specific term of years and protected against taxation as well. 25 U.S.C. §§ 348-49; Squire, 351 U.S. at 3-4. Indeed, the primary purpose of Congress in imposing the initial trust period on allotments was to prevent alienation of the lands and to ensure that the allottees would be immune from state taxation for a term of years. United States v. *Page 81 Mitchell, 445 U.S. 535, 543-44, 547 (dis. op.) (1980).[2] After an initial period during which fee simple patents were issued routinely, the trust period for allotments under the Act was repeatedly extended by Executive Order and, in fact, has now been extended indefinitely by Congress. Squire, 351 U.S. at 3 n. 4;County of Thurston, 586 F.2d at 1219; 25 U.S.C. § 462.
In the years prior to reversal of the national policy favoring the allotment of Indian lands, however, many Indians, including significant numbers of allottees on the Lac du Flambeau Reservation, were granted fee simple patents for their lands. TheChippewas of Lake Superior, at 110-11. Even though the policy favoring allotment has been reversed, the effects of the allotment process continue to be governed by the provisions of the Act. Cf. Blake v. Arnett, 663 F.2d 906, 911 (9th Cir. 1981).
The provisions of the Allotment Act regulating trust allotments and issuance of fee patents are contained principally in 25 U.S.C. §§ 348-49. of particular relevance to the question of state taxation of Indian fee patented lands is the following proviso in section 349:
 Provided, That the Secretary of the Interior may . . . cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent . . . .
(Emphasis supplied.)
Until recently 25 U.S.C. §§ 348-49, particularly the proviso language quoted above, has uniformly been construed as protecting allotments from taxation during the trust period, and as expressly authorizing taxation of allotted lands once a valid fee patent is issued. The following cases contain express recognition of the authority to tax Indian fee patented lands once the trust period has ended: Squire, 351 U.S. at 7-8; Mahnomen County, Minn.v. United States, 319 U.S. 474, 478 (1943); Mitchell445 U.S. at 543-44, 547; County of Thurston, 586 F.2d at 1221-22; Kirkwood,243 F.2d at 868-69; *Page 82 Board of Com'rs v. United States, 100 F.2d 929, 933 (10th Cir. 1938); United States v. Nez Perce County, Idaho, 16 F. Supp. 267,272 (D. Idaho, 1936), rev'd on other grounds, 95 F.2d 232 (9th Cir. 1938); United States v. Spaeth, 24 F. Supp. 465, 469 (D. Minn. 1938); Shepard v. United States, 162 F. Supp. 313, 315-16
(E.D. Wis. 1958); Nash v. Wiseman, 227 F. Supp. 552, 554 (W.D. Okla. 1963); Chatterton v. Lukin, 116 Mont. 419, 154 P.2d 798,799 (1944); Milne v. Leiphart, 119 Mont. 263, 174 P.2d 805,807-08 (1946); Heacock v. Tripp County, 60 S.D. 518, 244 N.W. 887,888-89 (1932); McGeehan v. Ashland County, 192 Wis. 177, 179,212 N.W. 283 (1927). See also Goudy v. Meath, 203 U.S. 146 (1906);Federal Indian Law at 859; Cohen at 425.
Perhaps the clearest statement of this principle is contained in the Supreme Court's description of the amendment creating the proviso quoted above:
 The Government argues that this amendment was directed solely at permitting state and local taxation after a transfer in fee, but there is no indication in the legislative history of the amendment that it was to be so limited . . . . The literal language of the proviso evinces a congressional intent to subject an Indian allotment to all taxes only after a patent in fee is issued to the allottee. This, in turn, implies that, until such time as the patent is issued, the allotment shall be free from all taxes, both those in being and those which might in the future be enacted.
Squire, 351 U.S. at 7-8 (emphasis added).
The previously settled interpretation of section 349 as authorizing taxation of Indian fee patented lands has, however, been questioned in the wake of McClanahan, 411 U.S. at 164 andMoe v. Confederated Salish Kootenai Tribes etc., 425 U.S. 463
(1976). See Estate of Johnson, 125 Cal. App. 3d 1044,178 Cal. Rptr. 823 (1982); Battese v. Apache County, 129 Ariz. 295,630 P.2d 1027 (1981); Baraga County Equalization Dept. v. Darcy, etal., Michigan Tax Tribunal no. 29713, decided Feb. 23, 1982 (unreported administrative decision concerning L'Anse Reservation created by Treaty of September 30, 1954); Cohen at 406-11.
The question of a state's authority to tax Indian fee patented lands has not been squarely addressed by the Supreme Court in the cases since Moe and McClanahan. Nonetheless, for the reasons *Page 83 
which follow, it is doubtful that those cases overruled, subsilentio, nearly eight decades of consistent judicial interpretation of 25 U.S.C. § 349 as expressly authorizing state property taxation of such lands.
McClanahan, of course, concerned state income taxes and did not discuss either the Allotment Act or the imposition of state property taxes in Indian lands. McClanahan does require that the state taxation of Indian reservation property be expressly authorized by Congress. The cases cited above have uniformly regarded 25 U.S.C. § 349 as providing such express authority. Moreover, the language of the proviso set forth above is clear and unambiguous, leaving no room for doubt as to the intent of Congress in enacting it. Squire, 351 U.S. at 7-8; cf. Bryan,426 U.S. at 392.[3]
In Moe, the Supreme Court held, inter alia, that Montana lacked authority under 25 U.S.C. § 349 to impose its personal property tax on motor vehicles owned by reservation Indians.425 U.S. at 477-79. Moe is not directly controlling for two closely related reasons. First, it dealt with a personal property tax on movable goods and not with a tax on realty. Secondly, the holding does not rely on, nor even discuss, the language of the section 349 proviso concerning removal of restrictions against taxation of the allotted land once a fee patent is issued. Instead, the court rejected the state's contention that the general reference in the first clause of section 349 to state civil and criminal laws authorized imposition of the particular state tax at issue. Aside from disagreeing with the state's interpretation of the literal language of the first part of section 349, the court essentially held that its general language was not a sufficiently express or unambiguous grant of taxing authority to the state to comply with the McClanahan standard. Moe, 425 U.S. at 479.
The Moe decision also rests, in part, on the Court's disapproval of the kind of "checkerboard" taxing jurisdiction which would necessarily be created if personalty located on fee lands were taxable while personalty located on trust lands were not. Id. To the extent the Court eschewed "checkerboard" taxing jurisdiction over personalty, *Page 84 
its reasoning arguably applies to Indian realty as well. Nonetheless, the modern policy disfavoring "checkerboard" jurisdiction is only a policy, however meritorious, unless based on statutory authority. In fact, 25 U.S.C. § 349 has not been repealed or even substantially amended since 1906.
Policy considerations alone cannot authorize ignoring the clear wording of a statute or disregarding the express intent of Congress: "The Supreme Court has cautioned that the courts cannot remake history or expand treaties and legislation beyond their clear terms to remedy a perceived injustice suffered by the Indians." United States v. State of Minn., 466 F. Supp. 1382,1385 (D. Minn. 1979); affd, Red Lake Band of Chippewa v. State ofMinnesota, 614 F.2d 1161 (8th Cir. 1980). See also Choctaw Nationof Indians v. United States, 318 U.S. 423, 432 (1943). policy alone cannot create an exemption from a tax which the statutes clearly authorize. Cf. United States v. Anderson, 625 F.2d 910
(9th Cir. 1980); United States v. Board of Com'rs of OsageCounty, 216 F. 883, 885 (8th Cir. 1914). Policy considerations, like canons of construction, do not confer "a license to disregard clear expressions of . . . congressional intent."DeCoteau v. District County Court for Tenth Jud. Dist., 420 U.S. 425,447 (1975).
In any event, "checkerboard" jurisdiction is not novel or unusual in Indian law, nor is it arbitrary or facially unconstitutional. Washington v. Yakima Indian Nation, 439 U.S. 463,499-502 (1979). Indeed, property taxation is inherently "checkerboarded" by its very nature, a fact which sharply distinguishes it from certain other areas of the law where checkerboard jurisdiction is mechanically unworkable.
Finally, I can find nothing in the cases decided since Moe
which persuasively suggests, much less holds, that 25 U.S.C. § 349
does not authorize state property taxation of Indian fee patented lands. Indeed, the Supreme Court has expressly referred to the Allotment Act as contemplating state taxation of such lands once the trust period has ended in one recent case.Mitchell, 445 U.S. at 543-44, 547; see also County of Thurston,586 F.2d at 1221.
In Estate of Johnson, a California intermediate appeals court decision, the court held that the Allotment Act does not authorize state inheritance taxes on the transfer of fee patented land from one *Page 85 
Indian to another, but expressly distinguished cases upholding state property taxation. Id. 178 Cal. Rptr. at 827 n. 3. InBattese, the Arizona Supreme Court held that Indian-owned real estate located within the present Navaho Reservation was not subject to state property taxation. 630 P.2d at 1027. The facts suggest, however, that the General Allotment Act had never applied to the lands in question and neither the act nor cases decided under it are discussed in the decision. Finally, theBaraga County decision (a copy of which has been supplied to you) is primarily concerned with defining which lands were part of the original L'Anse Chippewa Reservation. The decision neither cites nor discusses the Allotment Act and appears simply to assume, without discussion, that Indian fee lands located within the original reservation are not taxable by the state.
I am not persuaded that either Moe or the three state cases just discussed control the answer to your question of whether Indian fee patented lands within the Lac du Flambeau Reservation are subject to state property taxes. For the reasons discussed, it is my opinion that the state has express authority, pursuant to 25 U.S.C. § 349, to impose ad valorem property taxes on Indian fee patented lands located within the exterior boundaries of the reservation which were first allotted after February 8, 1887. Indian fee patented lands allotted prior to that date directly under the Treaty of September 30, 1854, are not taxable by the state under 25 U.S.C. § 349.
BCL:MAM
[1] To the extent the Band itself, rather than individual Indians, may have acquired fee title to certain reservation lands, the question of the state's authority to tax such tribal fee land is outside the scope of this opinion.
[2] Portions of the legislative history of the Allotment Act and of subsequent amendments to it are discussed in Mitchell; seealso Montana v. United States, 450 U.S. 544, 559 n. 9 (1981);County of Thurston; Nez Perce County, Idaho; Cohen at 127-43,Federal Indian law at 855-61.
[3] Bryan illuminates the principles governing a state's authority to tax Indian reservation property, as noted above, but the case neither cites nor discusses the Allotment Act itself. Instead Bryan addressed whether a state had express authority under Pub.L. No. 280, 67 Stat. 589, 28 U.S.C. § 1360, to impose a personal property tax on personalty (a mobile home) located on tribal trust lands.