STATE OF WISCONSIN, Plaintiff-Appellee, Cross-Appellant,

v.

Odric BAKER, et al., Defendants-Appellants, Cross-Appellees.

Nos. 81–2868, 81–2916.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1982.

Decided Jan. 26, 1983.

Richard B. Collins, Native American Rights Fund, Boulder, Colo., for defendants-appellants, cross-appellees.

John D. Niemisto, Mary V. Bowman, Asst. Attys. Gen., Wisconsin Dept. of Justice, Madison, Wis., for plaintiff-appellee, cross-appellant.

Gene M. Potack, James M. Jannetta, Kathryn L. Tierney, Howard J. Bichler, Wisconsin Judicare, Inc., Wausau, Wis., for amicus curiae.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and WEICK, Senior Circuit Judge.*

CUMMINGS, Chief Judge.

This case involves a jurisdictional dispute between the state of Wisconsin ("the State") and a band of American Indians. Each claims exclusive jurisdiction to regulate fishing and hunting by the general public in certain navigable lakes in Wisconsin. After a bench trial on the merits, the district court upheld the State's claim and granted declaratory and injunctive relief against defendant officials of the band. Defendants appeal from that final judgment; the State cross-appeals from four findings in the district court's opinion reported in 524 F.Supp. 726. For the reasons that follow, we affirm.

* The Honorable Paul C. Weick, Senior Circuit Judge of the United States Court of Appeals for

In 1848 Wisconsin became a state. Six years later the United States signed a treaty with the Chippewa Indians of Lake Superior and the Mississippi River. The terms of that treaty provided for the cession by the Chippewas of some seven million acres of land in northeast Minnesota in exchange for a promise by the United States "to set apart and withhold from sale, for the use of the Chippewas" certain tracts of land in Wisconsin and Michigan estimated as totalling roughly four hundred and eighty thousand acres. *United States v. Bouchard,* 464 F.Supp. 1316, 1331–1332 (W.D.Wis.1978). One of these tracts "equal in extent to three townships" (69,120 acres) was to be situated near a lake in northern Wisconsin known as "Lac Courte Oreilles." The band of Chippewas that settled on this tract is, appropriately enough, known as the Lac Courte Oreilles Band of Lake Superior Chippewa Indians ("the Band"). Defendants-appellants are officials of the Band.

The 1854 treaty did not fix the precise boundaries of the Band's reservation. Instead, the treaty provided that "the boundaries of [the Band's reservation] shall be hereafter agreed upon or fixed under the direction of the President [of the United States]." It was not until 1873 that a list of the parcels of land comprising the reservation was finally agreed upon and not until 1876 that the outer boundaries of the reservation were surveyed and fixed. Of the 69,120 acres of land in the 1873 list, the Band presently owns some 24%; individual members of the Band 39%; and non-members of the Band 37%.

Pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 461, 48 Stat. 984, the Band has enacted its own constitution. The constitution establishes a governing board ("the Governing Board") whose members are elected by the Band. Article 7 of the constitution empowers the Governing Board "to regulate, by enactment of ordinances, the activities of hunting, fishing,

the Sixth Circuit, is sitting by designation.

ricing, trapping, or boating by members and non-members of [on] all lands and waters" within the Band's reservation.

In 1976, the Governing Board enacted a "Fishing, Hunting, Trapping, and Ricing Code" ("the Code"). Sections of the Code purport to restrict fishing and hunting in all waters within the Band's reservation. Violators are subject to fines of up to $500 and incarceration in the Band's jails for up to six months.[1] Three days after the Code's effective date, the State filed suit in a Wisconsin circuit court against members of the Governing Board. The State sought a declaratory judgment that defendants' enforcement of the Code against non-members of the Band infringed upon the general public's right to fish, hunt, and recreate in navigable state waters.

Defendants removed the suit to federal district court under 28 U.S.C. § 1441 and the State moved for a preliminary injunction enjoining defendants from prohibiting non-members of the Band from fishing in certain navigable lakes without a license issued by the Band. The district court granted the State's motion on July 9, 1976 (App. 11a–12a), and some five years later, after a two-day bench trial, entered a final order awarding the State declaratory and permanent injunctive relief. The district court's final order declared that the State enjoys "exclusive jurisdiction to regulate hunting and fishing activities by non-members of [the Band] on and in the navigable waters lying within the outer boundaries of the [Band's] reservation" and that "[d]efendants enjoy no jurisdiction to regulate hunting and fishing activities by such non-members on and in such navigable waters" and permanently enjoined "defendants, their successors in office, their agents and employees from enforcing or attempting to enforce against any non-members of the [Band] on any navigable water[s] lying within the outer boundaries of the [Band's] reservation" the Code's fishing regulations. 524 F.Supp. at 735–736. This appeal and cross-appeal followed.

## I. Federal Question Jurisdiction

■ Section 1441(a) of Title 28 of the U.S.Code permits removal to a federal district court of "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." Because there is no diversity of citizenship between the State and defendants—a state is not a citizen of a state for purposes of diversity jurisdiction, *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596—removal of this action to the court below was proper only if the State's cause of action "arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a). Neither party raised this issue before us, but after hearing oral argument we ordered the filing of supplemental briefs addressing the jurisdictional question.[2] After examining those briefs and the relevant case law, we are convinced that the district court had original subject matter jurisdiction over this suit.

In its complaint, the State asserts as trustee for its public two distinct property interests: (1) title to the beds underlying navigable Wisconsin lakes and (2) the right to enjoy free access to the waters of those lakes "for purposes of navigation, fishing, hunting, swimming, commerce, enjoyment of scenic beauty, and general recreation." Both interests are descendant from federal law. Prior to Wisconsin's admission into statehood, the United States held these

---

1. In 1978, two months after the Supreme Court held in *Oliphant v. Suquamish Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209, that unless specifically authorized to do so by Congress, Indian tribes may not exercise criminal jurisdiction over non-Indians, the Governing Board amended the Code so that non-members of the Band who violate the Code's fishing and hunting restrictions are subject only to civil, not criminal, process in the Band's courts.

2. We note that newly revised Circuit Rule 9(b), effective January 10, 1983, requires that appellants include in their main briefs a jurisdictional summary "which will appear before the statement of the case and shall include an explanation of the statutory basis for the jurisdiction of the district court (if applicable) and of this court, as well as other information relevant to jurisdiction ...".

same interests in trust for the public pursuant to a 1783 deed of cession by four of the original 13 states and the Northwest Ordinance of 1787. See 1783 Virginia Act of Cession; Northwest Ordinance, Act of July 13, 1787, art. IV; reenacted Aug. 7, 1789, ch. 8, 1 Stat. 50; *Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565. These interests passed to Wisconsin upon admission into the Union pursuant to the Wisconsin Enabling Act of 1846, 9 Stat. 56, and the Act of March 3, 1847, 9 Stat. 178. The State argues—and the district court implicitly held—that because the lineage of its existing property interests in navigable lakes originates in federal law, the State's claim that defendants are infringing those interests "arises under" federal law.

■ We disagree. That a right of property was at one time governed by federal law or first conveyed by the United States does not render a suit to enforce that right one "arising under" federal law. *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 676–677, 94 S.Ct. 772, 781–82, 39 L.Ed.2d 73; *Shulthis v. McDougal,* 225 U.S. 561, 569–570, 32 S.Ct. 704, 706, 56 L.Ed. 1205; *Joy v. City of Saint Louis,* 201 U.S. 332, 341, 26 S.Ct. 478, 480, 50 L.Ed. 776; *Shoshone Mining Co. v. Rutter,* 177 U.S. 505, 507–508, 20 S.Ct. 726, 727, 44 L.Ed. 864. Only if federal law continues to govern the right, see *Oneida Indian Nation,* 414 U.S. at 676–677, 94 S.Ct. at 781–82, *Joy,* 201 U.S. at 342–343, 26 S.Ct. at 481, or if the suit is to decide whether the United States did, in fact, originally convey it, see *Borax Consolidated, Ltd. v. City of Los Angeles,* 296 U.S. 10, 22, 56 S.Ct. 23, 29, 80 L.Ed. 9; *Smith v. Kansas City Title and Trust Co.,* 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577; does an action to enforce that right "arise under" federal law. "The federal nature of the right to be established is decisive—not the source of the authority to establish it." *Puerto Rico v. Russell & Co.,* 288 U.S. 476, 483, 53 S.Ct. 447, 449, 77 L.Ed. 903. Were it otherwise, anyone claiming title to real estate in the western United

States could bring suit in federal court since title to all lands in those parts of the nation is traceable to a federal grant or law. *Shoshone Mining Co. v. Rutter, supra,* 177 U.S. at 507, 20 S.Ct. at 726.

■ The suit before us is not to decide what property rights in navigable lakes Wisconsin acquired when it was admitted to the Union in 1848. For that matter, defendants concede that when Wisconsin became a state it acquired the rights it asserts in this suit. Rather, the State claims that it continues to hold in trust for the public the same property rights it acquired in 1848 and that defendants are infringing those rights. That claim "arises under" federal law, however, only if federal law continues to govern property rights in the beds and waters of navigable Wisconsin lakes. It does not. The grant of statehood to Wisconsin was a grant both of property rights and of sovereign power. In 1848 the United States conveyed to Wisconsin property interests in navigable waters and the power to determine by its own laws the future course of ownership of those interests. "After a State enters the Union, title to the land [under navigable waters] is governed by state law." *Montana v. United States,* 450 U.S. 544, 551, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493. Whether the State retains in trust for the public the same title to Wisconsin lake beds and the same fishing and hunting rights in Wisconsin waters it acquired in 1848 is, therefore, entirely a matter of Wisconsin law, subject only to the exercise by the United States of one of its constitutional powers.[3] *Montana, id.; Oregon ex rel. State Land Board v. Corvallis Sand and Gravel Co.,* 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550; *United States v. Holt State Bank,* 270 U.S. 49, 54–55, 46 S.Ct. 197, 198–99, 70 L.Ed. 465; *Shively v. Bowlby,* 152 U.S. 1, 40, 14 S.Ct. 548, 562, 38 L.Ed. 331; *Wilcox v. Jackson,* 38 U.S. (13 Pet.) 498, 517, 10 L.Ed. 264; *Mobil Oil Corp. v. Coastal Petroleum Co.,* 671 F.2d 419 (11th Cir.1982); *Heirs of Burat v. Board of Levee Commissioners,* 496 F.2d 1336 (5th Cir.1974).

---

**3.** The State does not contend that federal law requires it to continue to hold in trust for the public the same fishing and hunting rights it acquired in 1848.

In addition to the claim that defendants have infringed property rights it holds in trust for the public, the State makes another claim in its complaint. The State asserts that defendants have no right under the 1854 treaty to regulate public fishing and hunting in any navigable Wisconsin lakes. Complaint ¶¶ 19, 22. There is no question that this claim "arises under" federal law. The State relies directly upon a federal treaty to defeat a federal right—the right to prevent the general public from fishing and hunting in navigable lakes—asserted by the Band in its constitution and 1976 Code and by defendants in enforcement of that Code against the general public. Federal interest in providing a federal forum for a claim that denies the existence of a right founded upon federal law is no less than for a claim that asserts the existence of such a right. The rationale for providing federal tribunals for the adjudication of federal rights—that state tribunals might treat federal rights ungenerously—applies equally to both types of claim. That rationale is especially applicable in the case before us where the State in effect claims that its state-created property interests are superior to an Indian tribe's federally-created property interests. See *United States v. Kagama*, 118 U.S. 375, 383, 6 S.Ct. 1109, 1113, 30 L.Ed. 228 ("Because of the local ill feeling, the people of the States where they [Indian tribes] are found are often their deadliest enemies").

But it is the plaintiff that stands to benefit in this suit if a state court casts an unsympathetic eye upon federal rights. That may partly explain why the State initiated this action in one of its own courts and why defendants promptly petitioned for removal to federal court. At any rate, this fact—that defendants are the claimants of the federal right to be protected from rough treatment at the hands of a state court—raises the question whether the State's claim under the 1854 treaty is well-pleaded.

It was long ago established that a litigant may not gain access to federal court by artful pleading, *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194, and that only those allegations necessary to state a claim for the relief requested are to be considered in deciding whether a plaintiff's claim "arises under" federal law. Thus a plaintiff may not "sneak" into federal court by inserting into his complaint federal claims that rebut defenses he anticipates his opponent will raise, *Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126. The rationale for this is that the anticipated defense might never be raised, or if it is raised, never reached because the plaintiff fails to prevail on a preliminary issue of state law. There is no federal interest, and a strong state interest, in providing a forum for the litigation of purely state law issues between citizens of the same state. Mishkin, *The Federal "Question" in the District Courts,* 53 Colum.L.Rev. 157, 164–165 (1953); Wechsler, *Federal Jurisdiction and the Revision of the Judicial Code,* 13 Law & Contemp.Prob. 216, 227–229 (1948).

Looked at one way, the State's claim that defendants do not have a federal right to exclude the public from navigable lakes looks like an attempt to secure entry into federal court by rebutting an anticipated defense. Had the State sued only for an injunction enjoining defendants from infringing public property rights in navigable lakes, that claim would have arisen only in replication to a claim by defendants that the 1854 treaty conferred such rights upon them,[4] and a federal court would not have had jurisdiction over it.[5] Looked at another way, however, the State's federal claim looks like an attempt to force litigation of a claim that defendants could bring in federal court. Defendants could have sued in federal court to enjoin state officials responsible for issuing state fishing licenses from

---

**4.** See Wis.Stat. § 844.16 (1973) as to requirements for complaint dealing with interference with real property interest.

**5.** The waiver by the United States in 28 U.S.C. § 2409a(a) of its immunity to quiet title actions does not "apply to trust or restricted Indian lands . . .".

licensing persons to fish and hunt in the navigable lakes over which the Band claims jurisdiction. See Wis.Stat. § 844.01 (1973); *Mescalero Apache Tribe v. New Mexico,* 630 F.2d 724 (9th Cir.1980), vacated and remanded, 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234, reinstated, 677 F.2d 55, certiorari granted, —— U.S. ——, 103 S.Ct. 371, 74 L.Ed.2d 506. Had they done so, the State's federal claim would have arisen as a defense and a federal court would have had jurisdiction over it.

Looked at the first way—we assume without deciding that the only coercive action the State could bring against defendants is one for an injunction to enjoin a continuing trespass against public property rights in navigable waters (see, *e.g., Baker v. Voss,* 217 Wis. 415, 259 N.W. 413 (1935)) —the State's federal claim is not well-pleaded, given that the Declaratory Judgment Act, 28 U.S.C. § 2201, did not expand the original jurisdiction of federal courts. *Skelly Oil, supra,* 339 U.S. at 671–672, 70 S.Ct. at 878–79. Looked at the second way, however, the State's federal claim is well-pleaded. True, it is anticipatory in that it is a defense to a coercive action defendants could have brought, but have not yet brought, in federal court. But it is precisely this kind of anticipation that the Declaratory Judgment Act was intended to allow. Thus unless the district court was required to look the first way at the State's complaint, it had original jurisdiction over this suit.

When an alleged patent infringer sues for a declaratory judgment that a patent is invalid or uninfringed, he asserts a federal claim that could have arisen either as a replication in a state coercive action, *American Well Works Co. v. Layne & Bowler Co.,* 241 U.S. 257, 36 S.Ct. 585, 60 L.Ed. 987, or as a defense in an action in federal court for patent infringement. It has long been established that federal courts have original subject-matter jurisdiction over such a suit. *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (*sub silentio*); *Jungerson v. Ostby & Barton Co.,* 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235 (*sub silentio*); *Hanes Corp. v. Millard,* 531 F.2d 585 (D.C.Cir.1976); *Grip Nut Co. v. Sharp,* 124 F.2d 814 (7th Cir.1941); *E. Edelmann & Co. v. Triple-A Specialty Co.,* 88 F.2d 852 (7th Cir.1937); *JFD Electronics Corp. v. Channel Master Corp.,* 229 F.Supp. 514 (S.D.N.Y. 1964); see also *Jewell Ridge Coal Corp. v. Local No. 6167, UMW,* 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534 (*sub silentio*). We see no jurisdictional basis for distinguishing a declaratory suit by an alleged patent infringer from the case at bar. Each directly involves a claim of national concern—one that the United States did not confer a monopoly over a certain product; the other that the United States did not confer a monopoly over fishing and hunting in certain navigable lakes. Each claim necessarily appears—as a logical prerequisite to the declaration requested—in the plaintiff's complaint.[6] Federal interest in providing a federal forum arguably may be greater for suits "arising under" patent law than for suits "arising under" federal Indian treaties given that original jurisdiction over patent suits is exclusive, 28 U.S.C. § 1338—although the danger of state hostility to adverse property claims by American Indian tribes would seem greater than the danger to infringement claims by patent holders— but the difference goes to whether state courts enjoy concurrent jurisdiction, not to whether federal courts enjoy original jurisdiction. And state interest in policing conduct by state officials, as well as federal interest in minimizing friction between federal and state governments, may be greater in the case at bar than in a patent suit, but that difference goes to whether a federal court should abstain from exercising its jur-

---

**6.** Although the State alleges in its complaint that navigable lakes are not within the Band's reservation and the defendants therefore lack jurisdiction to restrict public fishing and hunting in them, the State does not expressly pray for a declaratory judgment to that effect. But the district court inferred such a prayer from the allegations in the State's complaint, and given that plaintiffs in declaratory judgment suits define their own causes of action and that six and one-half years have elapsed since the State filed suit, we are not prepared to insist on a more restrictive interpretation of the State's complaint.

isdiction, not to whether it has original jurisdiction in the first instance. See *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971.

Accordingly, we conclude that the district court had original subject-matter jurisdiction over this action and that removal from state court under 28 U.S.C. § 1441 was proper.[7]

## II. *Sovereign Immunity*

We have yet another jurisdictional threshold to cross before reaching the merits of this appeal. In the district court, defendants moved to dismiss this suit on the ground that though the State's complaint named individual members of the Band as defendants, the suit was in effect against the Band and the Band enjoyed sovereign immunity from suit. The district court denied the motion, holding that because the 1854 treaty did not confer upon the Band exclusive fishing and hunting rights in navigable lakes, defendants acted beyond the scope of their authority as members of the Band's governing board when they restricted public fishing and hunting in navigable lakes. 524 F.Supp. at 734–735; see also *Bouchard*, 464 F.Supp. at 1380–1383. On appeal, defendants continue to assert the validity of their sovereign immunity defense but claim that in order to have this controversy resolved on the merits, the Band waived its immunity from this suit by tribal resolution four months after the district court entered final judgment against defendants. They argue that because of this post-judgment waiver, the question whether the Band's sovereign immunity bars this action is now moot, and that we should therefore vacate the district court's ruling on that question. If we choose not to vacate the district court's sovereign immunity ruling, defendants urge us to reverse it.

■ When circumstances beyond an appellant's control render moot a question de-

cided and appealed from, a federal appellate court will vacate the decision below. *Great Western Sugar Co. v. Nelson*, 442 U.S. 92, 99 S.Ct. 2149, 60 L.Ed.2d 735; *Duke Power Co. v. Greenwood County*, 299 U.S. 259, 57 S.Ct. 202, 81 L.Ed. 178. The rationale is that preclusive effect should not be accorded a judgment from which a litigant has the right of appeal when he is unable to exercise that right. *Great Western Sugar Co.*, 442 U.S. at 93–94, 99 S.Ct. at 2149–50; *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–40, 71 S.Ct. 104, 106–07, 95 L.Ed. 36. Were it otherwise, winning litigants could prevent reversal of erroneous decisions by deliberately mooting cases on appeal, *Federal Trade Commission v. Food Town Stores, Inc.*, 547 F.2d 247, 249 (4th Cir.1977), and the preclusive effect of appealable judgments in cases mooted on appeal would be greater than in cases susceptible of review.

■ Circumstances beyond defendants' control have not prevented them from exercising their right of appeal from the judgment below. They exercised that right by filing a notice of appeal and later voluntarily attempted to waive the sovereign immunity defense in this Court in the apparent hope of escaping the preclusive effect of the district court's rejection of that defense. Had they decided not to file a notice of appeal, or had they simply abandoned their appeal after filing it, the district court's adverse sovereign immunity decision would not have been deprived of preclusive effect. *Federated Department Stores v. Moitie*, 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103; *Hubbell v. United States*, 171 U.S. 203, 18 S.Ct. 828, 43 L.Ed. 136; *Wilson's Executor v. Deen*, 121 U.S. 525, 7 S.Ct. 1004, 30 L.Ed. 980. We see no reason why it should be otherwise when defendants file a notice of appeal and then purport to waive a defense advanced and thoroughly litigated before

---

7. Because we hold that the State's claim that defendants lack federal jurisdiction to restrict public fishing and hunting "arises under" federal law, we need not consider the State's novel contention that Indian tribes are covered by the Tenth Amendment and that defendants' enforcement of the Code against non-Indians is a violation of that Amendment.

the district court.[8]  See *Cover v. Schwartz,* 133 F.2d 541, 546–547 (2nd Cir.1942), certiorari denied, 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703.  Defendants gambled when they chose to litigate the sovereign immunity issue in district court and they lost.  Just as winning litigants may not bolster the preclusive effect of final judgments by deliberately mooting questions on appeal, so losing litigants may not destroy their preclusive effect by adopting the same ploy. Whether sovereign immunity bars this suit was a live issue when the district court decided it, and defendants' change of heart on appeal has not effected a loss of life below.[9]

Even assuming that the Band had the power to waive its sovereign immunity after the adverse decision on that issue, see *United States v. Oregon,* 657 F.2d 1009 (9th Cir.1981); *Merrion v. Jicarilla Apache Tribe,* 617 F.2d 537 (10th Cir.1980), affirmed, 454 U.S. 886, 102 S.Ct. 379, 70 L.Ed.2d 201, it is doubtful whether the Band did in fact successfully waive it in this case.  While this appeal was pending, defendants—in their capacity as members of the Band's governing board—adopted a resolution authorizing their attorneys of record to waive the Band's sovereign immunity to this suit.[10]  In their briefs filed with this Court, defendants characterize this resolution as a waiver.  We see no proper basis for that characterization.  The language in the resolution is that of delegation, not

waiver.  The resolution purports only to delegate to defendants' appellate attorneys the power to waive the Tribe's immunity to this suit.  Nothing in it purports to waive that immunity.  See n. 4 *supra.*  Nor does it appear—assuming that the Band has the power to authorize its attorneys to waive its immunity on its behalf—from the record before us that defendants' attorneys ever exercised the power delegated to them.  We are aware of no formal waiver executed by defendants' attorneys, nor does an express waiver of immunity appear anywhere in defendants' briefs filed on appeal.  Thus to find a waiver one must read between the lines of defendants' briefs.  Though we are loath to do so given the jealousy with which federal law guards against forfeiture of American Indian rights, see *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 ("It is settled that a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'") (quoting *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114), because defendants argue for reversal of the ruling denying sovereign immunity in the same breath that they claim to have waived immunity, we think that if defendants did intend to effect some sort of waiver before this Court, at most they intended to condition that waiver upon our applying it retroactively to vacate the district court's ruling against sovereign im-

---

**8.**  Defendants' attempt to waive immunity retroactively is tantamount to a Rule 15(d) motion under the Federal Rules of Civil Procedure to file a supplemental answer relating back to their original pleading.  Such motions are routinely denied when granting them would upset a concluded or well-advanced litigation.  *United States v. Wissohickon Tool Works, Inc.,* 200 F.2d 936 (2nd Cir.1952); *Ohio-Sealy Mattress Manufacturing Co. v. Kaplan,* 90 F.R.D. 40 (N.D.Ill.1981) ("What plaintiffs here seek to reverse, however, is not an unwitting omission in the pleadings but a conscious decision which has shaped the conduct of this litigation for the past seventeen months."); *United States v. International Brotherhood of Electrical Workers, Local 130,* 72 F.R.D. 507 (E.D.La.1976); *Ebel v. Drum,* 55 F.Supp. 186 (D.Mass.1944).

**9.**  We do not mean to suggest that a sovereign may not exercise its powers retroactively.  Cf.

*Flower Cab Co. v. Petitte,* 685 F.2d 192 (7th Cir.1982).  To apply new standards to past conduct is, however, one thing; to apply new litigation tactics to an already adjudicated litigation is quite another.

**10.**  The relevant part of the post-judgment resolution reads:

Now, THEREFORE, BE IT HEREBY RESOLVED, that the Governing Board of the Lac Courte Oreilles Tribe hereby authorizes its attorneys of record on appeal in this case to waive the defense of sovereign immunity of the Tribal Governing Board on the issue of whether the Tribe has reserved to it the exclusive and/or preferential use of the navigable waters within the boundaries of the Lac Courte Oreilles Reservation for fishing, hunting, and ricing. App. 75a.

munity. Since a waiver now does not moot issues that were properly before the district court, defendants have not lost their right of appeal by waiving their immunity before this Court. Cf. *Cover v. Schwartz*, 133 F.2d 541 (2nd Cir.1942), certiorari denied, 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703.

Defendants contend that absent an effective waiver they are immune from this suit first because the Band is immune from suit and secondly because they acted on behalf of the Band when they attempted to restrict public fishing and hunting in navigable lakes. The district court rejected defendants' second contention, holding that because the 1854 treaty did not confer upon the Band power to restrict public fishing and hunting in navigable lakes, defendants were not acting on behalf of the Band when they attempted to exercise such power. Defendants argue that the district court erred in looking to the 1854 treaty to determine the scope of their authority as Band officials. They argue that the constitution of the Band, not the 1854 treaty, defines the limits of their authority to act on behalf of the Band and that the Band's constitution does indeed authorize members of its Governing Board to restrict public fishing and hunting in navigable lakes.

■ At a superficial level, defendants' argument is appealing. A federal official is immune from suit unless a plaintiff alleges either that the United States did not delegate to the official the power to act as he did or that his exercise of that power violates the federal Constitution. *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628. By analogy, defendants should be immune from suit unless the State alleges in its complaint either that the Band did not delegate to defendants the power to restrict public fishing and hunting or that the exercise of that power violates that Constitution.

But the argument has a fatal flaw: The argument assumes that common law sovereign immunity protects a sovereign's officials from suit even when they set out to do what their sovereign lacks the power to do. It does not. When a federal officer—or state officer for that matter—violates the federal Constitution, he exercises a power that his sovereign does not enjoy. That is the rationale for stripping him of his authority and immunity as a federal or state officer: *viz.*, he has exercised a power that his sovereign was powerless to convey to him.[11] See *Ex Parte Young*, 209 U.S. 123, 160, 28 S.Ct. 441, 454, 52 L.Ed. 714. By analogy, an official of an Indian tribe should be stripped of his authority, and corresponding immunity, to act on behalf of his tribe whenever he exercises a power that his tribe was powerless to convey to him.

By and large, however, limitations upon the sovereignty of Indian tribes are found not in the federal Constitution, see *Talton v. Mayes*, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196, but in the federal statutes and treaties by which the United States exercises its plenary power to restrict tribal sovereignty, see *Cherokee Nation v. Southern Kansas Railway Co.*, 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295, at least, that is, plenary power to restrict tribal sovereignty over non-tribal members, *Montana v. United States*, 450 U.S. 544, 563–564, 101 S.Ct. 1245, 1262–63, 67 L.Ed.2d 493; *United States v. Wheeler*, 435 U.S. 313, 326, 98 S.Ct. 1079, 1087, 55 L.Ed.2d 303, and its power to extinguish the sovereign immunity of Indian tribes, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58–59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106. The Constitution of the United States apportions sovereign power between the United States and the several states, not among the United States, the several states, and the Indian Tribes. Were Indian officials susceptible to suit only whenever they either violated the federal Constitution or exceeded the powers delegated to them by their tribe, they

---

11. It is apparently an unsettled question whether state officials enjoy immunity from suit when they violate a federal statute that creates a private right of action. Cf. *Maine v. Thibou-* *tot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555; *Adden v. Middlebrooks*, 688 F.2d 1147 (7th Cir.1982).

would enjoy an immunity from suit far broader in scope than that enjoyed by federal and state officials. A tribal official would enjoy immunity from suit whenever he exercised a power delegated to him by his tribe even if his tribe were powerless to make the delegation. Federal and state officials enjoy an immunity from suit coterminous with federal and state sovereignty and there is no reason why federal common law should afford Indian officials broader immunity than federal and state officials enjoy. See *Swift Transportation, Inc. v. John*, 546 F.Supp. 1185 (D.Ariz.1982); *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 519 F.Supp. 418 (D.Ariz.1981). "Immunity from suit·is an attribute of sovereignty," *Nevada v. Hall*, 440 U.S. 410, 415, 99 S.Ct. 1182, 1185, 59 L.Ed.2d 416, a privilege that attaches to sovereign rank. If a sovereign's powers are limited, then so too must the immunity of that sovereign's officials be limited.

■ Defendants do not contend that the sovereignty of the Band over navigable lakes and Wisconsin citizens fishing and hunting in those lakes is unlimited. They concede that whatever sovereignty the Band enjoys over public fishing and hunting derives from the 1854 treaty. We therefore conclude that the district court did not err in holding that defendants enjoy immunity from this suit only if the 1854 treaty conferred upon the Band the power that the Band in turn conferred upon defendants to restrict public fishing and hunting in navigable lakes. Since the treaty did not do so (*infra* Part III), defendants' sovereign immunity defense must fail.

III. *The Effect of the 1854 Treaty Upon State Sovereignty Over Navigable Waters*

The 1854 treaty between the United States and the Chippewa Indians reserved "for the use of" the Band a tract of land in central Wisconsin "equal in extent to three townships." Nineteen years after the signing of that treaty, the United States and the Band prepared a list of land parcels—with a total dry acreage (about 69,120)

roughly equivalent to that of three townships—included within the tract reserved to the Band, and three years later, the United States surveyed those land parcels and prepared a map designating the outer boundaries of the Band's reservation. Defendants claim that nineteen navigable lakes are wholly or partly within those outer boundaries, that the 1854 treaty conferred upon the Band the exclusive right to fish and hunt in the waters of those lakes, and that defendants therefore enjoy the power to restrict public fishing and hunting in those lakes. The State of course denies each of these claims. The district court found that though the outer boundaries of the reservation do encompass or intersect nineteen navigable lakes, and though the Band understood in 1854 that it would enjoy exclusive fishing and hunting rights in all waters within the outer boundaries of its reservation, the 1854 treaty did not confer such rights upon the Band, and the Band therefore lacks jurisdiction to restrict public fishing and hunting in navigable lakes. On appeal, defendants argue that the district court erred in holding that the fishing and hunting rights conferred upon the Band are not exclusive.

■ There are weighty reasons for presuming that the 1854 treaty did not confer upon the Band exclusive hunting and fishing rights in navigable Wisconsin lakes. In 1846, the United States authorized the people of Wisconsin "to form a constitution and State government, for the purpose of being admitted into the Union on an equal footing with the original States in all respects whatsoever. . . ." Wisconsin Enabling Act of 1846, 9 Stat. 56. Pursuant to that grant of authority, the people of Wisconsin adopted a constitution providing for a republican form of government, and in 1848 Wisconsin became a state and a government elected by the people of Wisconsin was vested with all of the same powers possessed by the governments of the original thirteen states. Act of March 3, 1847, 9 Stat. 178. The power to regulate fishing and hunting in navigable lakes is one of those powers, *Montana v. United States*, 450 U.S. 544,

551–552, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493, and exercising that power so as to "promote the happiness and prosperity" of the people that elected it is one of the primary responsibilities of the Wisconsin government, *Charles River Bridge v. Warren Bridge,* 36 U.S. (11 Pet.) 420, 547, 9 L.Ed. 773. Because the people of Wisconsin have a compelling interest in seeing that powers reposed in their government are not surrendered to private, non-representative groups, and because the continued vitality of our Union ultimately depends upon the continued faith of the public in their elected governments, we are loath to adopt an interpretation of the 1854 treaty that would divest the State of this power. *Massachusetts v. New York,* 271 U.S. 65, 89, 46 S.Ct. 357, 361, 70 L.Ed. 838; *Charles River Bridge, supra,* 11 Pet. at 547, 9 L.Ed. 773. Thus regardless of whether the Chippewas believed in 1854 that their treaty with the United States conferred upon them the power to prohibit public fishing and hunting in navigable lakes, unless it plainly appears that the United States intended to divest Wisconsin of some of its sovereignty

over non-Indians, we will not interpret the treaty as conferring that power upon the Chippewas.[12]

The United States shares the interest of the Wisconsin citizenry in preserving state sovereignty. It undertook to admit Wisconsin into the Union on an "equal footing" with the original states. Presumably that undertaking reflects a belief that it is better to distribute power evenly than unevenly throughout a union of states and that a local government is better able than a national government to promote public welfare in matters of local concern. We know of no reason to suppose that the United States abandoned these beliefs in the six years between the date it admitted Wisconsin into the Union on an "equal footing" with the other states and the date the United States reserved "for the use of" a band of Chippewa Indians some sixty-nine thousand acres of dry land in Wisconsin.

Even assuming that the Constitution empowers the United States to effect a post-statehood conveyance of sovereignty over navigable state lakes to a band of Indians,

---

12. In a case argued on the same day as the one before us, this Court adopted the rule that Indian treaties are to be interpreted as the Indians who negotiated them understood them. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voight,* 700 F.2d 341 (7th Cir. 1983). The rationale for this rule is that federal law should resolve ambiguities in treaty language against the party best equipped to prevent them and it is less burdensome for the United States to communicate its intentions unambiguously in a treaty drafted in English than it is for a tribe of non-English-speaking Indians to discern the precise meaning of technical language in a treaty. See *Washington v. Washington State Commercial Passenger Fishing Vessel Assoc.,* 443 U.S. 658, 675–676, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823; *Voight* at 350. Resolving disputes about meaning in favor of the Indians is a way of encouraging the United States to express itself more plainly when it drafts a treaty negotiated with the Indians, and thereby ensuring that agreements between the United States and the Indians are voluntary in the sense that the Indians understand the terms of those agreements. See *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 630–631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615.

Our decision not to afford the Indians' understanding of the 1854 treaty controlling weight in this case is not at odds with our holding in

*Voight.* There are other concerns besides facilitating communication between the United States and the Indians that may come into play when a court is asked to resolve a dispute regarding the interpretation of an Indian treaty. Preserving the power of state governments to promote public welfare is one such concern, *Charles River Bridge, supra* 11 Pet. at 547, 9 L.Ed. 773, and it is a weightier one than is the concern for facilitating communication between the United States and the Indians. Thus when, as in the case before us, interpreting a treaty as the Indians understood it would have the effect of divesting a state of some of its sovereign power over non-Indians, we will not adopt a rule that requires us to interpret the treaty as the Indians understood it. *Montana,* 450 U.S. at 552–553, 101 S.Ct. at 1251–52; *id.* at 567–568, 101 S.Ct. at 1265 (Stevens, J. concurring). *Voight* did not involve a challenge to a state's sovereignty over non-Indians. The issue before us in *Voight* was whether pre-statehood treaties between the United States and Chippewa Indian tribes conferred upon the Chippewas a conditional right to fish and hunt on public lands. We held that the treaties did confer such a right and we remanded the case to the district court for a determination as to the permissible scope of state regulation.

we must therefore presume—absent evidence of a contrary intention "definitely declared or otherwise made plain," or of a "public exigency" sufficient to warrant an inference of such an intention—that the United States did not exercise that power in 1854 when it signed a treaty with the Chippewa Indians. *Montana, supra* 450 U.S. at 552, 101 S.Ct. at 1251, quoting *United States v. Holt State Bank,* 270 U.S. 49, 55, 46 S.Ct. 197, 199, 70 L.Ed. 465. Defendants argue that the importance to the Band of fisheries secure from the threat of public invasion was sufficiently great in 1854 to overcome this presumption. The district court disagreed and so do we. There is nothing in the language or history of the treaty to suggest that in 1854 the United States was more solicitous of Chippewa fishing and hunting rights in navigable waters than of state sovereignty. See *Montana, supra* 450 U.S. at 556, 101 S.Ct. at 1253; compare *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (treaty in which United States granted Indian tribe lands in fee simple and expressly pledged that "no Territory or State shall ever have a right to pass laws for the government of the [tribe] . . . and that no part of the land granted to them shall ever be embraced in any Territory or State" held to confer upon tribe sovereignty over navigable river given history of injustice suffered by tribe), construed in *Montana,* 450 U.S. at 555–556 n. 5, 101 S.Ct. at 1253 n. 5, and *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (*pre-statehood* reservation "until otherwise provided by law" of group of islands for use of tribe that sustained itself by fishing in navigable waters adjoining those islands held to convey to tribe exclusive right to fish in those navigable waters). The Chippewas may have feared in 1854 that public fishing and hunting in navigable lakes within their reservation would one day threaten their fisheries—although that day has apparently not yet come, since defendants do not contend that public fishing and hunting pose an imminent threat to the "political integrity, the economic security, or the health or welfare" of the Band.

*Montana, supra* 450 U.S. at 566, 101 S.Ct. at 1258. And the Chippewas may have believed that when that day came they would possess the power to exclude the public from their fisheries. But neither the history of Chippewa life prior to 1854 nor the level of public fishing and hunting in waters near Chippewa settlements in 1854 was such as to charge the United States with knowledge of the Chippewas' understanding or to warrant the inference that the United States intended to convey such a power. See District Court Findings of Fact Nos. 40–58 at 524 F.Supp. 729–730. Nor can we say that in 1854 the United States was so intent upon preserving tribal life that had it foreseen that public fishing and hunting would one day threaten Chippewa fisheries it would have divested Wisconsin of some of its sovereignty. Section three of the 1854 treaty reserves to the President of the United States the power to allot parcels of reservation land to individual members of the Band, and in 1875, the President began to exercise that power. From the 1840's to the early 1900's the United States employed this practice—converting tribal property to individual property by allotting reservation lands to individual Indians—in an effort to "civilize" Indians and destroy their tribal ways of life. See F. Cohen, *Handbook of Federal Indian Law,* ch. 11 (1942).

▪ In sum, because the 1854 treaty did not expressly reserve exclusive rights in navigable waters (see *Blake v. Arnett,* 663 F.2d 906, 911 (9th Cir.1981)), Finding No. 83, 524 F.Supp. at 732, and because circumstances in 1854 were not such as to justify an inference that the United States intended to reserve such rights, we agree with Judge Doyle that the 1854 treaty did not convey to the Band sovereignty over navigable waters within its reservation and that exclusive sovereignty over them is in the State. 524 F.Supp. at 733–735.

## IV. *The State's Cross-Appeal*

In its opinion, the district court expressly found that the outer boundaries of the

Band's reservation encompass navigable lakes. 524 F.Supp. at 734–735 n. 2; *id.* at 732–733, Findings Nos. 86, 87. That finding is also implicit in the reference to "navigable waters lying within the outer boundaries of the Lac Courte Oreilles Reservation" in the district court's final judgment. App. 74a. In its cross-appeal, the State contends that this finding is erroneous. It argues that the Band had no understanding in 1854 about whether the boundaries of its reservation would be drawn so as to include navigable lakes, that when the Band selected parcels of land in 1873 to be included among the 69,120 acres of land comprising its reservation, it excluded meandered waters in order to maximize its acreage of dry land, that the acreage of dry land within the reservation equals 69,120 and that any exclusive rights in navigable waters that the Band enjoys, it enjoys by reason of its ownership of riparian lands, not by reason of any conveyance by the United States of such rights.

We need not decide in this case whether the outer boundaries of the Band's reservation encompass navigable lakes because regardless of whether they do, defendants lack jurisdiction to restrict public fishing and hunting in them.[13] We therefore vacate the district court's finding on that issue, and order that the district court's appended judgment be modified by substituting "lakes adjacent to the dry lands of the Lac Courte Oreilles Reservation" for that part of the first sentence of the judgment after "navigable" and by substituting the same phrase for that part of the third sentence of the judgment after "navigable" through "October 23, 1981".

Affirmed as modified.

13. We do not decide today whether the Band enjoys fishing and hunting rights in these navigable lakes superior to those enjoyed by the general public. We decide only that the Band does not enjoy jurisdiction to restrict public fishing and hunting in them. Defendants argue that even if the Band's fishing and hunting rights in navigable waters near its reservation

APPENDIX

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WISCONSIN

CIVIL ACTION No. 76-C-359

STATE OF WISCONSIN,

Plaintiff,

vs.

ODRIC BAKER, et al.,

Defendants.

JUDGMENT

This action came on for trial before the Court, Honorable JAMES E. DOYLE, United States District Judge, presiding, and the issues having been duly tried and a decision having been duly rendered,

It is Ordered and Adjudged that there resides in the State of Wisconsin exclusive jurisdiction to regulate hunting and fishing activities by non-members of the Lac Courte Oreilles Band on and in the navigable waters lying within the outer boundaries of the Lac Courte Oreilles Reservation, as those boundaries are defined in finding 86, in the opinion and order entered on October 23, 1981. Defendants enjoy no jurisdiction to regulate hunting and fishing activities by such non-members on and in such navigable waters.

It is Further Ordered and Adjudged that defendants, their successors in office, their agents and employees are enjoined from enforcing or attempting to enforce against any non-members of the Lac Courte Oreilles Band on any navigable water[s] lying within the outer boundaries of the Lac Courte Oreilles Reservation, as defined in finding 86, in the opinion order entered on October 23, 1981, the provisions of Section

are not exclusive, they are certainly superior to the public's fishing and hunting rights in those waters. That may be (see *Puyallup Tribe, Inc. v. Department of Game,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667), but even then defendants would be unable to regulate the public. Furthermore, defendants did not raise this argument below, a requisite for consideration here.

VIII of the Fishing, Hunting, Trapping, and Ricing Code of the Lac Courte Oreilles Band, which was implemented on or about May 24, 1976.

It is Ordered and Adjudged that plaintiff recover of defendants its costs of action.

Approved as to form:

Dated this 26th day of October, 1981.

BY THE COURT:

/s/ JAMES E. DOYLE
District Judge

Dated at Madison WI, this 26th day of October, 1981.

/s/ JOSEPH W. SKUPNIEWITZ
Clerk of Court