In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2618

State of Wisconsin,

Plaintiff-Appellant,

v.

Environmental Protection Agency
and Christie Whitman,/*

Defendants-Appellees,

and

Sokaogon Chippewa Community,

Intervening Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 96-C-90--Charles N. Clevert, Judge.

Argued November 6, 2000--Decided September 21, 2001

 Before Kanne, Diane P. Wood, and Williams,
Circuit Judges.

 Diane P. Wood, Circuit Judge.  Although
the general model of sovereignty suggests
that different sovereign states normally
occupy different geographic territories,
see, e.g., Restatement (3d) of the
Foreign Relations Law of the United
States, sec. 201 (1986), the existence of
federations and confederations shows that
overlapping sovereignty is also a common
feature of modern political organization.
In this case, we confront one of the more
complex kinds of overlapping sovereignty
that exists in the United States today:
that between the States and Indian
tribes. The Supreme Court addressed one
aspect of that relationship in its 2000
Term in Nevada v. Hicks, 121 S. Ct. 2304
(2001), which held that tribal
authorities lacked legislative
jurisdiction to regulate the activities
of state officials on reservation land
when those officials were investigating
off-reservation violations of state law.
Id. at 2318. A different aspect of the
same relationship is before us here:

namely, whether the Environmental Protection Agency (EPA), acting through authority delegated to it by statute, was empowered to treat a particular tribe as a "state" for purposes of certain water quality rules. Like the district court, we conclude that the EPA acted properly in doing so, and we thus affirm the district court's judgment rejecting the challenge Wisconsin has brought to the EPA's action.

I

A.   The Clean Water Act

The Clean Water Act (the Act) prohibits the discharge of pollutants into navigable waters unless the discharge is sanctioned by a permit or statute. See 33 U.S.C. sec. 1311(a). Permits are issued by the EPA or by state agencies subject to EPA review. Id. at sec. 1342. The Act also gives states the authority to establish water quality standards for waters within their boundaries (id. at sec. 1313), to certify compliance with those standards (id. at sec. 1341), and to issue and enforce discharge permits (id. at secs. 1342, 1319), all under the watchful eye of the EPA. Like other states, Wisconsin has enacted its own federally approved comprehensive water pollution regulatory system. See Wis. Adm. Code chapters 33, 280, 281, NR 100-91, and NR 102-106.

In 1987, Congress amended the Act to authorize the EPA to treat Indian tribes as states under sec. 518 of the Act. Once a tribe has treatment-as-state (TAS) status, the statute permits it to establish water quality standards for bodies of water within its reservation and to require permits for any action that may create a discharge into those waters. 33 U.S.C. sec. 1377(e). In 1991, after full notice-and-comment rule-making, the EPA issued a final rule implementing this provision and setting forth the requirements Indian tribes would have to meet in order to be granted TAS status:

(1) the tribe must be federally recognized;

(2) the tribe must have a governing body carrying out substantial governmental duties and powers;

(3) the functions to be exercised by the tribe must pertain to the management and protection of water resources which are held by the tribe, held by the United States in trust for the tribe, or otherwise within the borders of the reservation; and

(4) the tribe must be capable of carrying out the functions of the Act.

40 C.F.R. 131.8(a); see also 33 U.S.C. secs. 1377(e)(1)-(3).

Relying heavily on the Supreme Court's decision in Montana v. United States, 450 U.S. 544 (1981), the EPA concluded that this was neither a plenary delegation of inherent authority to tribes to regulate all reservation waters, nor was it a standard that precluded tribal regulation of any non-member or any off-reservation activity. See 56 Fed. Reg. at 64877. Instead, the agency chose a case-by-case approach under which a tribe attempting to satisfy element (3) of the regulation would have to show that it possesses inherent authority over the waters in light of evolving case law. See 56 Fed. Reg. at 64878. There was no question that tribes could regulate the activities of tribal members, undertaken on the reservation, in order to protect the quality of reservation waters. In addition, the EPA concluded that "a tribe may regulate the activities of non-Indians on fee lands within its reservations when those activities threaten or have a direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id.

The EPA acknowledged that this will usually be an easy showing, based on "generalized findings" that water quality is related to human health and welfare. See id. Although the EPA stated that it would make a case-specific determination with regard to the scope of each tribe's authority, once a tribe has shown that impairment of the waters on the reservation would have a serious and substantial effect on the health and welfare of the tribe, the EPA presumes that there has been an adequate showing of inherent authority. Id. at 64879.

B. The Mole Lake Band and its Application For TAS Status

The waters at issue in this case are lakes and streams adjacent to or surrounded by the reservation of the Sokaogon Chippewa Community, also known as the Mole Lake Band of Lake Superior Chippewa Indians (the Band), located in northeastern Wisconsin. The Mole Lake reservation is unusual in two respects. First, the Band is heavily reliant on the availability of the water resources within the reservation for food, fresh water, medicines, and raw materials. In particular, Rice Lake, the largest body of water on the reservation, is a prime source of wild rice, which serves as a significant dietary and economic resource for the Band. Second, all of the 1,850 acres within the reservation are held in trust by the United States for the tribe. None of the land within the reservation is controlled or owned in fee by non-members of the tribe.

In August 1994, the Band applied for TAS status under the Act. Wisconsin opposed the application, arguing that it was sovereign over all of the navigable waters in the state, including those on the reservation, and that its sovereignty precluded any tribal regulation. Nevertheless, after elaborate administrative proceedings, on September 29, 1995, the EPA approved the Band's application, finding that the tribe had satisfied all of the requirements of 40 C.F.R. sec. 131.8, including the necessary demonstration of its inherent authority over all water resources on the reservation. In keeping with its earlier positions, the EPA noted that the inherent authority question did not turn on who had title to the land underneath the waters.

This grant of TAS status alarmed the State of Wisconsin, which saw it as both an affront to the state's sovereignty and, more pragmatically, as an action with the potential to throw a wrench into the state's planned construction of a huge zinc-copper sulfide mine on the Wolf River, upstream from Rice Lake. Concerned about its loss of authority over certain territory within its outer boundaries and worried that the tribal water standards might limit the activities of the mine by prohibiting some or all of the discharge

from the mine, Wisconsin filed this action in district court on January 25, 1996, reiterating its challenge to the EPA's grant of TAS status to the Band. (The United States and the EPA waived immunity under 5 U.S.C. sec. 702.) The state's case raises a fundamental challenge to the TAS grant; the relief it seeks is outright revocation of the grant, rather than mere accommodation for any particular project. We are therefore satisfied that the issue is ripe now and need not await the Band's promulgation of specific water quality standards. If Wisconsin is right, it is entitled to have the EPA's creation of a state-like entity within its borders voided--an action that lies within the power of the court. See Community Trend Service, Inc. v. Commodity Futures Trading Comm'n, 233 F.3d 981 (7th Cir. 2000). Similarly, it is one in which a failure to review the issue now would cause hardship to the parties. Id.

In April 1999, the district court upheld the TAS grant, finding that the EPA's determination that a tribe could regulate all water within the reservation, regardless of ownership, was a reasonable interpretation of the relevant statutes and regulations. Wisconsin now appeals.

II

We review a grant of summary judgment de novo, Doe v. Howe Military Sch., 227 F.3d 981, 990 (7th Cir. 2000), applying the same standards as the district court: we will set aside an agency determination only if it is "procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." See United States v. Mead Corp., 121 S.Ct. 2164, 2171 (2001); see also the Administrative Procedure Act, 5 U.S.C. sec. 706(2)(A) (set aside agency decision if arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law). We should uphold the agency's determination as long as it considered relevant data under the correct legal standards and offered a satisfactory explanation for its actions. See Howard Young Med. Ctr., Inc. v. Shalala, 207 F.3d 437, 441 (7th Cir. 2000). Moreover, the EPA here has interpreted the statute by promulgating formal regulations, using plenary notice-and-comment procedures, and then

implementing its rule with respect to the Band through a formal process in which the state was entitled to be heard. Its regulations and subsequent decision are therefore entitled to deference under Mead, 121 S. Ct. at 2171, and Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1994).

Wisconsin is challenging the EPA's findings only with respect to the third requirement for TAS status--the demonstration of the tribe's inherent authority to regulate water quality within the borders of the reservation. Wisconsin gives three reasons why the EPA's determination that the tribe had established such authority was unreasonable.

1. Not "Within the Borders"

For the first time on appeal, Wisconsin contends that Rice Lake is not "within the borders" of the reservation because the legal description of the reservation runs only to the Lake's highwater mark. This argument is waived, however, because Wisconsin did not present it to the EPA. See Vermont Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 553-54 (1978). Furthermore, even if we could overlook this waiver and considered the argument on its merits, we would reject it. As the map attached to the Stipulated Joint Appendix illustrates, Rice Lake is almost completely surrounded by reservation land (and the small percentage that is not abuts off-reservation trust lands). If the EPA had been given a chance to consider this point, it would have been completely reasonable for it to interpret the phrase "within the borders" to include such a body of water.

2. No Authority Because No Title

Second, Wisconsin argues that the tribe does not have authority over the water resources on the reservation because the state has ownership of the underlying lake beds. We will assume for the purposes of this appeal that, pursuant to the Equal Footing Doctrine, the state does indeed have title to the lake beds within the reservation. See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S.

261, 283-88 (1997); Utah Div. of State Lands v. United States, 482 U.S. 193, 195-96 (1987).

This court has indeed held that, in some situations, state ownership of lake beds may restrict a tribe's authority to regulate the waters running over those beds. In Wisconsin v. Baker, 698 F.2d 1323, 1335 (7th Cir. 1983), we found that, because the state of Wisconsin held title to the underlying lake beds in a reservation, the Chippewa Band was precluded from restricting hunting and fishing in the reservation waters.

But contrary to Wisconsin's assertions, Baker does not dispose of this case. Most importantly, Baker did not involve a particular statute under which Congress specified that tribes would be entitled to be treated as states under particular circumstances, and both Congress and the responsible agency outlined the regulatory authority tribes were to exercise. The legal structure governing Baker involved only the treaty that created the reservation, and that treaty did not contain any language regarding the tribe's power to regulate reservation waters. The Clean Water Act, by contrast, explicitly gives authority over waters within the borders of the reservation to the tribe and does not even discuss ownership rights. Secondly, the Baker court explicitly stated that the "defendants do not contend that public fishing and hunting pose an imminent threat to the 'political integrity, the economic security, or the health or welfare' of the Band." Id. at 1335. Thus, the Baker court left open the possibility that state ownership of lake beds may not preclude tribal authority over the waters if tribal regulation was necessary to protect the "political integrity, the economic security, or the health or welfare" of the Band, as both parties concede is the case here. Thirdly, Baker was about hunting and fishing rights, which have traditionally been the subject of state regulation, while the ultimate authority for the water quality standards lies with the federal EPA, not the state of Wisconsin (which itself has acted only pursuant to federal delegation).

Baker therefore has little or no application to the case before us. We find pertinent instead a number of legal

principles all of which support the EPA's determination that a state's title to a lake bed does not in itself exempt the waters from all outside regulation. First, "the power of Congress to regulate commerce among the states involves the control of the navigable waters of the United States." Coyle v. Smith, 221 U.S. 559, 573 (1911). This power has not been eroded in any way by the Equal Footing Doctrine cases, which "involved only the shores of and lands beneath navigable waters. [The doctrine] cannot be accepted as limiting the broad powers of the United States to regulate navigable waters under the Commerce Clause." Arizona v. California, 373 U.S. 546, 597–98 (1963). Unlike the situation in Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers, 531 U.S. 159 (2001), here no one disputes that the waters at issue are "navigable waters" for purposes of either the Clean Water Act or the Commerce Clause.

The breadth of federal authority over Indian affairs is equally well-established: "The Constitution vests the Federal Government with exclusive authority over relations with Indian tribes." Montana v. Blackfeet Tribe, 471 U.S. 759, 764 (1985); United States v. Wheeler, 435 U.S. 313, 319 (1978) ("Congress has plenary authority to legislate for the Indian tribes in all matters."); U.S. Const., Art. I, sec. 8, cl. 3. In fact, in the absence of tribal TAS status, the EPA and not the state of Wisconsin might well be the proper authority to administer Clean Water Act programs for the reservation, because state laws may usually be applied to Indians on their reservations only if Congress so expressly provides. See California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207 (1987).

Because the state does not contend that its ownership of the beds would preclude the federal government from regulating the waters within the reservation, it cannot now complain about the federal government allowing tribes to do so. It was reasonable for the EPA to determine that ownership of the waterbeds did not preclude federally approved regulation of the quality of the water, and we uphold that determination.

3. No Inherent Authority over Off-

Reservation Activities

Finally, Wisconsin argues that the Band did not make the required showing of authority over those activities potentially affected by its imposition of water quality standards. Because the EPA has determined that, unlike the Clean Air Act, the Clean Water Act is not an express delegation of power to tribes, see 56 Fed. Reg. at 64880, the EPA requires tribes to show that they already possessed inherent authority over the activities undoubtedly affected by the water regulations. EPA regulations allow a tribe to establish this authority by showing that impairment of the reservation's waters would affect "the political integrity, the economic security, or the health or welfare of the tribe." 56 Fed. Reg. at 64877.

This regulatory language tracks the Supreme Court's decision in Montana v. United States, supra, in which the Court recognized the general rule that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," 450 U.S. at 565, but went on to hold that "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566. See also Atkinson Trading Co., Inc. v. Shirley, 121 S. Ct. 1825 (2001). The regulations also track the more recent Supreme Court language in Strate v. A-1 Contractors, 520 U.S. 438 (1997), by noting that authority is usually proper because "water quality management serves the purpose of protecting public health and safety, which is a core governmental function, whose exercise is critical to self-government." 56 Fed. Reg. at 64879. (We note too that this case does not involve any question of the tribe's ability to restrict activities of state law enforcement authorities on the reservation, when those officials are investigating off-reservation crimes, and thus the rule of Hicks, 121 S. Ct. 2304, is not implicated.)

Once a tribe is given TAS status, it has the power to require upstream off-

reservation dischargers, conducting activities that may be economically valuable to the state (e.g., zinc and copper mining), to make sure that their activities do not result in contamination of the downstream on-reservation waters (assuming for the sake of argument that the reservation standards are more stringent than those the state is imposing on the upstream entity). See Albuquerque v. Browner, 97 F.3d 415 (10th Cir. 1996). Such compliance may impose higher compliance costs on the upstream company, or in the extreme case it might have the effect of prohibiting the discharge or the activities altogether. This is a classic extraterritorial effect, which Wisconsin argues is impermissible and takes this case beyond the scope of Montana, which concerned only tribal authority over non-member activities on reservation fee lands.

 But this is not the only situation where upstream and downstream users may have different standards and some accommodation is necessary. Wisconsin's argument could be made equally if the downstream regulator were Illinois, yet in that case the need for the two states to coordinate their standards, or for the upstream company to comply with the more stringent rules, would be clear. In fact, Congress anticipated this very problem in the statute, and it had the following to say about it:

The Administrator shall, in promulgating such regulations [for TAS status], consult affected States sharing common water bodies and provide a mechanism for the resolution of any unreasonable consequences that may arise as a result of differing water quality standards that may be set by States and Indian tribes located on common bodies of water. Such mechanism shall provide for explicit consideration of relevant factors including, but not limited to, the effects of differing water quality permit requirements on upstream and downstream dischargers, economic impacts, and present and historical uses and quality of the waters subject to such standards. Such mechanism should provide for the avoidance of such unreasonable consequences in a manner consistent with the objective of this chapter.

33 U.S.C. sec. 1377(e).

The EPA has developed the mechanism called for by the statute, which allows it to mediate conflicting interests when a tribe's standards differ from those of a state. See also 33 U.S.C. sec. 1341(a). In addition, once a tribe is given TAS status, the Act gives it the same right as that given to states to object to permits issued for upstream off-reservation activities. See 56 Fed. Reg. at 64887. In deciding whether to issue a permit for discharge within a state that may violate the water quality standards of a downstream tribe, the EPA may ask the parties to engage in mediation or arbitration, in which the decision-maker and the EPA administrator, who has the final authority over the issuance of the permit, will consider such factors as "the effects of differing water quality permit requirements on upstream and downstream dischargers, economic impacts, and present and historical uses and quality of the waters subject to such standards." 33 U.S.C. sec. 1377(e). The EPA may then ask the tribe to issue a temporary variance from its standards for the particular discharge or may ask the state to provide additional water pollution controls. See 54 Fed. Reg. at 39099-101; 56 Fed. Reg. at 64885-89; 40 C.F.R. secs. 121.11 through 121.16. This mechanism, rather than a futile effort to avoid extraterritorial effects, is the way both Congress and the agency sought to accommodate the inevitable differences that would arise.

We say "inevitable" because activities located outside the regulating entity (here the reservation), and the resulting discharges to which those activities can lead, can and often will have "serious and substantial" effects on the health and welfare of the downstream state or reservation. There is no case that expressly rejects an application of Montana to off-reservation activities that have significant effects within the reservation, and it would be exceedingly hard to say that the EPA's interpretation is contrary to law in the face of the express recognition of this issue and the choice of a solution in the statute itself. It was reasonable for the EPA to determine that, since the Supreme Court has held that a tribe has inherent authority over activities having a serious effect on the health of the

tribe, this authority is not defeated even if it exerts some regulatory force on off-reservation activities.

Finally, we think Wisconsin exaggerates the power of the tribe to veto upstream discharge activities. The tribe cannot impose any water quality standards or take any action that goes beyond the federal statute or the EPA's power. To the contrary, the EPA supervises all standards and permits. Far from allowing a tribe to veto a state permit, granting TAS status to tribes simply allows the tribes some say regarding those standards and permits. It is quite possible that, in particular cases, perhaps through the vehicle of the statutory mediation mechanism, the EPA may require the tribe's more stringent standards to give way to upstream discharge and development. Whether the tribe or the state ultimately "wins" in the dispute, it is the EPA, not the tribe or the state, that has the ultimate authority to decide whether or not to issue a permit.

Because the Band has demonstrated that its water resources are essential to its survival, it was reasonable for the EPA, in line with the purposes of the Clean Water Act and the principles of Montana, to allow the tribe to regulate water quality on the reservation, even though that power entails some authority over off-reservation activities. Since a state has the power to require upstream states to comply with its water quality standards, to interpret the statutes to deny that power to tribes because of some kind of formal view of authority or sovereignty would treat tribes as second-class citizens. Nothing in sec. 1377(e) indicates that Congress authorized any such hierarchy. Particularly in light of the deference we owe to the EPA's decisions here, we see nothing that would justify our setting aside the agency's action.

III

We conclude that the EPA's grant of TAS status to the Band is not arbitrary, unreasonable, or contrary to law and we therefore AFFIRM the district court's judgment. We note once again in closing that the EPA's decision in each case seeking TAS status is fact-specific. In this case, both parties conceded that the

waters within the Band's reservation are very important to the Band's economic and physical existence. Additionally, the reservation here is unusual in that there are no parcels of fee land within the reservation owned by non-members of the tribe. We have no occasion to say whether, on a different set of facts, the EPA might extend the notion of a tribe's "inherent authority" to affect off-reservation activities so far as to go beyond the standards of the statute or the regulations. If it ever arises, that will be another case, for another day.

FOOTNOTE

/* Pursuant to Fed. R. App. P. 43(c), Christie Whitman is substituted as a party for Carol M. Browner.